DECISION.
This case has been sua sponte removed from the accelerated calendar.
{¶ 1} Defendant-appellant Stephon Johnson appeals the judgment of the Hamilton County Court of Common Pleas convicting him of fourteen counts of attempted murder and fourteen counts of felonious assault with accompanying firearm specifications as a result of a nine-hour standoff with police. Johnson also appeals the trial court's imposition of the maximum prison term for his escape from a court-ordered treatment facility. For the reasons set forth below, we affirm.
 {¶ 2} The following facts are undisputed. Since 1999 Johnson has suffered from a severe mental disorder. Johnson has received various diagnoses, including paranoid schizophrenia, bipolar disorder, depressive melancholia, schizoaffective disorder and psychosis-NOS. Johnson, who has a history of not taking his medication regularly, has been psychiatrically hospitalized six times in the last two and a half years for bizarre behavior and suicide attempts. He has also been probated on two occasions.
 {¶ 3} On December 24, 2000, Johnson was admitted to the psychiatric ward of University Hospital for damaging his mother's home and for bizarre behavior. After he was discharged from the hospital on December 31, 2000, Johnson lived on the streets and stayed with various relatives, including his cousin. Although Johnson had been prescribed medication during his hospital stay, there was a problem with his medical card, and Johnson was unable to receive the medication after he left the hospital.
 {¶ 4} Shortly before 9:00 p.m. on January 7, 2001, Johnson told his cousin to leave his residence with his children, because Johnson had something he wanted to do with the police. Johnson then began firing his gun out a window of the residence into the street below. After Johnson had fired several shots, including one shot that went through the roof of an unoccupied vehicle, neighbors began calling the Cincinnati police.
 {¶ 5} When police arrived, they found Reverend Cornell Sweet, his wife, and another passenger in a vehicle on the street. Reverend Sweet told police that he had been driving his vehicle near Johnson's residence when a bullet fired by Johnson's gun entered through the driver's door and struck him in his upper thigh. The bullet crossed through his groin area and lodged in his right thigh. Police officers assisted the injured Reverend Sweet and his passengers to a safe location. Reverend Sweet was then transported from the scene for medical treatment.
 {¶ 6} During this time, Johnson continued to fire gunshots from the residence, so the police evacuated local businesses, rerouted traffic, and set up a perimeter around the residence. The SWAT team was contacted, and arriving SWAT members replaced uniformed police officers inside the perimeter. Police negotiators and Johnson's family began attempting to contact Johnson by bullhorn, public address, and telephone.
 {¶ 7} Sometime after dark, a civilian vehicle inside the police perimeter began to proceed toward the residence. Police officers Rick Malone and Anthony Bruccato, in an effort to alert the unknown driver of the ongoing events by using spotlights and yelling at him, exposed their hidden position, which was across the street from the Johnson residence and near a retaining wall at an intersection. As they did so, Johnson fired his gun toward the officers. Officer Malone testified that the shots ricocheted off the street and struck the embankment above his head.
 {¶ 8} The police then responded by authorizing a sniper shot to protect the two officers. A police sniper fired a single shot at the muzzle-flash position in the front window of the second floor of the residence. Following the shot, there was a period of silence. The police, uncertain about whether Johnson had been hit by the sniper, attempted to use an entry team to check on Johnson as well as other potential victims inside the residence. The entry team, which consisted of police specialists Todd Brunner, Andy Nogueira, Samuel Sala and Brian Meyer, police officers Scott Krauser and Dan Kowalski, and Sergeant Arthur Schultz, attempted to use a side door to the residence through a narrow walkway on the left side of the house. While the officers were on the side of the house, Johnson fired a shot out a side window toward the officers below. Upon hearing the shot, the officers realized that Johnson was alive, and they retreated to safety.
 {¶ 9} Throughout the night and into the early morning hours, police continued their efforts to get Johnson to surrender by firing tear-gas canisters into the residence and by attempting to contact him by public address and telephone. At one point, Johnson picked up the telephone and asked police negotiators about the tear gas. As daylight approached, police specialists John Rose, Eric Vogelpohl, Ronald Hale, and Clifton Mitchell were positioned on a deck behind a home that was located northwest of Johnson's residence. From approximately 3:55 a.m. to 6:00 a.m., Johnson fired his gun toward the officers while they fired tear-gas canisters into the residence. The police twice returned fire.
 {¶ 10} Negotiators and Johnson's family continued their efforts to contact Johnson. At 6:12 a.m., Johnson picked up the telephone and began talking with police negotiators. At 6:43 a.m., he agreed to come out of the residence. Johnson followed police instructions and exited through the front door of the residence. Johnson was taken into police custody and read his Miranda rights. He refused to answer police questions and asked to speak to an attorney. When police searched the residence, they found ninety-three unfired .40-caliber shell casings placed in various rooms. A subsequent police investigation uncovered fifty-three spent .40-caliber shell casings in various areas outside the residence.
 {¶ 11} On January 18, 2001, Johnson was indicted for fourteen counts of attempted murder in violation of R.C. 2903.02(B) and fourteen counts of felonious assault in violation of R.C. 2903.11(A)(2). Each of the charges was accompanied by a firearm specification. Johnson subsequently entered pleas of not guilty and not guilty by reason of insanity and asked the trial court to evaluate his competency to stand trial. The trial court ordered Johnson to submit to a psychiatric evaluation. Dr. David Chiappone, a licensed clinical psychologist, performed the examination and found Johnson to be incompetent.
 {¶ 12} At a competency hearing on March 21, 2001, the parties stipulated to the contents of Dr. Chiappone's report, and the trial court found Johnson incompetent to stand trial. The trial court ordered Johnson to the Summit Behavioral Heath Care Organization for treatment. During his treatment, Johnson jumped a fence and walked to his father's home. He turned himself in to the police the following day. Johnson was subsequently charged with escape in violation of R.C. 2921.34(A) under a separate case number.
 {¶ 13} On July 3, 2001, the trial court found that Johnson had been restored to competency. Thereafter, Johnson changed his plea to not guilty by reason of insanity, and the trial court ordered that Johnson be examined to determine his state of mind at the time of the offenses. A bench trial began on October 9, 2001. Because the state and Johnson had stipulated to the facts as set forth in the indictment, as well as to the exhibits offered by the state, the trial testimony focused primarily on Johnson's mental state at the time of the offenses.
 {¶ 14} The state presented testimony from police sergeant Douglas Ventre, who had been in charge of the SWAT team on the night of the charged offenses, police officer Malone, who had been positioned across the street from Johnson's residence, police specialist Noguiera, who had been a part of the entry team, and Dr. Robert Tureen, a licensed clinical psychologist. Sergeant Ventre, Officer Malone, and Specialist Nogueira each testified about Johnson's actions during his standoff with the police and about Johnson's appearance and demeanor at the time of his surrender and arrest. Each testified that Johnson, who was wearing a dark shirt and pants, walked out the front door of the residence with a cordless phone in his hand and surrendered to police. When the trial court inquired about Johnson's appearance, each stated that Johnson had a runny nose and reeked of a chemical agent, but was otherwise calm and expressionless. They further testified that Johnson appeared to be aware of the police and was able to follow their instructions.
 {¶ 15} Dr. Tureen testified that he had interviewed Johnson for an hour in August 2001 and reviewed a series of documents for purposes of determining Johnson's mental state at the time of the charged offenses. Dr. Tureen testified that Johnson had told him that he had intended to commit suicide that night because of the mental anguish and pain that he was experiencing. Johnson had stated that he was not taking his prescribed medications and was repeatedly hearing Bible verses in his head. Johnson told Dr. Tureen that he had a pistol, which he had purchased following an assault upon him in December 2000. Johnson stated that he could not shoot himself for religious reasons, so he got the idea to commit suicide by getting the Cincinnati police to shoot him. Johnson stated that he had told his cousin to take his children and leave the premises because he did not want them to get hurt. Johnson then called for emergency assistance and began firing shots out the window. When the police arrived, Johnson told Dr. Tureen, he continued to fire more shots out the window. During this time, Johnson also stated that he could hear his family outside asking him to surrender. Johnson told Dr. Tureen that he had spent the night trying to decide whether to live, that he had eventually decided that he wanted to live, and that he had given himself up without a struggle.
 {¶ 16} Dr. Tureen testified that, in his opinion, Johnson suffered from a bipolar disorder and a schizoaffective disorder, both of which were severe mental illnesses. Dr. Tureen testified, however, that he did not believe that Johnson was legally insane at the time he committed the offenses. Dr. Tureen based his opinion on the fact that Johnson's behavior at the time of the offenses was well organized, that Johnson had a sufficient awareness of what he was doing, that Johnson understood the wrongfulness of his behavior, and that he understood the possible consequences of that behavior.
 {¶ 17} Dr. Tureen stated that, in his opinion, Johnson was not actively delusional during the standoff because someone who was delusional typically acted irrationally or impulsively by exhibiting chaotic behavior, orienting to voices, and possessing a sense of fearfulness. Dr. Tureen stated that he had found no evidence that Johnson had acted in this manner during the standoff. Dr. Tureen also stated that there was no evidence of Johnson responding to commands or explanations that were hallucinations ordering Johnson to do something. Dr. Tureen stated that the evidence demonstrated instead that Johnson had been calm and controlled when he told his cousin to leave the premises; that he had strategically placed ammunition around the residence and was able to avoid police gunfire and tear gas throughout the entire nine-hour standoff; that he was complacent when he was arrested, and that he had asked for an attorney immediately following his arrest. Dr. Tureen stated that, in his opinion, these instances demonstrated not only that Johnson had a sense of organization and planning, but also that Johnson had a sense of presence of mind and control such that he knew what he was doing and the wrongfulness of the situation he was involved in. Consequently, Dr. Tureen opined that Johnson was sane at the time of the charged offenses.
 {¶ 18} In response, Johnson presented testimony from his mother, Ivy Gray, and three experts, Dr. James Hawkins, Dr. Glenn Weaver, and Dr. Chiappone.
 {¶ 19} Gray testified that her son had attended college, had been in the Army National Guard, and had been employed as a stockbroker until sometime in 1998 when he came to her house and would not leave his room. Gray testified that Johnson began to exhibit bizarre behavior over the course of the next six months and that she first took Johnson to the hospital sometime in December 1998. During his twelve-day stay, Johnson was diagnosed with bipolar disorder.
 {¶ 20} Gray testified that, from that point forward, Johnson kept acting bizarrely and repeatedly attempted to commit suicide. She described a cycle where Johnson was admitted to the hospital for several weeks at a time, and then, upon his release, he would stop taking his medication at some point and relapse into bizarre and suicidal behavior, for which he would be hospitalized again. Gray testified that on December 24, 2000, Johnson became aggressive, throwing his weights through the windows in her home and "crashing up" her house, so she called police and asked them to take Johnson to the hospital. While Johnson was in the hospital, Gray stated, she tried to have him probated, but Johnson was released before this could occur. Gray stated that she next received a call from her nephew on January 7, 2001, telling her that Johnson was in his home randomly firing a gun out the window. Gray went to the scene and told police that Johnson was mentally ill. She testified that she fainted when she heard that Reverend Sweet had been shot, so she did not get a chance to speak with Johnson that evening. During cross-examination, Gray denied making statements to medical personnel that she and other relatives had been afraid of Johnson because of his unpredictable and assaultive behavior.
 {¶ 21} Dr. Hawkins, a licensed psychiatrist, examined Johnson at the court's request in August 2000. Dr. Hawkins testified that he listened to Johnson's account of the offenses, talked with Johnson about his history, and performed a mental-status examination during his meeting with Johnson. Dr. Hawkins stated that he also reviewed a series of documents prior to rendering his opinion.
 {¶ 22} Dr. Hawkins testified that Johnson had trouble collecting his thoughts and providing him with a coherent, rational and cohesive account of the offenses. Johnson told Dr. Hawkins that he was not taking his medications at the time of the charged offenses; and he kept hearing Bible verses in his head. Johnson stated that a police officer named Fox had been harassing him and that he needed to protect himself because of some altercation that had taken place earlier, that he had purchased a gun, and that he had carried it with him to protect himself. Johnson told Dr. Hawkins that he went to his cousin's house with a gun, called the police, and then started shooting out the windows toward the police, so the police would return fire and kill him.
 {¶ 23} Dr. Hawkins testified that, in his opinion, Johnson suffered from a schizoaffective disorder, which was a serious mental illness, and that Johnson did not appreciate the wrongfulness of his actions at the time of the charged offenses. Dr. Hawkins based his opinion on the fact that Johnson had a long history of severe psychiatric illness, including paranoia, that he had been suicidal in the past, and he had not been taking his medication at the time of the offenses. Dr. Hawkins testified that, in his opinion, Johnson was psychotic at the time of the offenses because he was operating under the delusional belief that a particular Cincinnati police officer named Fox was harassing him, and because he was experiencing great psychic distress manifested by the Bible verses running through his mind. Dr. Hawkins stated that Johnson had set up a situation based upon his delusional belief that if he aggravated the police enough by telling them that he was going to shoot them and by then firing shots out the window, the police would then come and automatically kill him.
 {¶ 24} Dr. Hawkins admitted on cross-examination that Johnson knew that he was interacting with the police, that he knew the consequences of his actions, and that each of the steps Johnson had taken that night could appear logical and reasonable. Hawkins also admitted that Johnson had not been acting under a command-type hallucination. Dr. Hawkins explained, however, that, in his opinion, the focus should have been on Johnson's thoughts rather than on his actions. Hawkins testified that, in his opinion, Johnson's whole thought process was illogical on the night of the charged offenses. Hawkins testified that if Johnson had been thinking logically at the time, he would have either gone after the police officer named Fox, who he thought had been harassing him, or he would have committed suicide. Thus, Dr. Hawkins concluded that Johnson was not sane at the time of the charged offenses because he had a history of severe mental illness, he was not taking his medications, he was suicidal and paranoid, he was operating under a delusional belief, and his plan to commit suicide by using police was bizarre and illogical.
 {¶ 25} Dr. Weaver, a licensed forensic psychiatrist, testified that he interviewed Johnson in September 2001 at the request of defense counsel, and that he had examined a series of documents in order to determine Johnson's mental state at the time of the charged offenses. Dr. Weaver testified that, during his interview with Johnson, Johnson recounted the time leading up to his standoff with the police. Johnson told Dr. Weaver that he had not been taking his medication, and that, as a result, he had been hospitalized in December 2000. During the same time, Johnson also stated, he had been involved in an altercation and had bought a gun for protection.
 {¶ 26} Johnson told Dr. Weaver that after he had been discharged from the hospital on December 31, 2000, there was a problem with his medical card, and he was unable to get his medication. Johnson also stated that he had lived with his relatives for a brief period of time after his discharge, including his cousin. Johnson told Dr. Weaver that while he was staying with his cousin, he became more depressed and wanted to commit suicide, but that he could not do so for religious reasons. Johnson stated that he was hearing voices and Bible verses, both of which kept running through his head. Consequently, Johnson stated, he decided to have the police kill him.
 {¶ 27} Johnson told his cousin to take his two children and leave the house. He then called for emergency assistance and told the operator to send the police. When the police arrived, Johnson stated, he then began firing his gun out the window at random over their heads. Johnson told Weaver he did not want to hit the police, but that he simply wanted to draw their fire so he would be killed. Johnson stated, however, that after a lengthy period of time had passed where he had exchanged gunfire with the police, he decided to surrender and was taken into police custody.
 {¶ 28} During the interview, Johnson told Dr. Weaver that he had become involved in a cult and that as a result of this involvement he had developed particular powers that enabled him to use voodoo. Johnson told Dr. Weaver that he blamed his conduct and behavior on his experiences with the cult. Johnson further stated that, since his incarceration, he had been unable to practice his voodoo because he had had no contact with "the elements." Johnson stated, however, that he had since discovered that he could have contact with "the elements" by flushing his socks down the toilet. Dr. Weaver testified that Johnson was psychotic during the interview.
 {¶ 29} Dr. Weaver testified that, in his opinion, Johnson suffered from a schizoaffective disorder, which was a serious mental illness. Dr. Weaver further opined that Johnson did not know the wrongfulness of his actions at the time he committed the charged offenses. Dr. Weaver based his opinion on the fact that Johnson had a long history of mental illness and that he had stopped taking his medication. Dr. Weaver testified that, in his opinion, Johnson's failure to take his medication led to an upsurge in his symptoms, causing him to be depressed, suicidal, and psychotic. Dr. Weaver further testified that Johnson's actions on the night of the offenses were consistent with his behavior on prior occasions that had resulted in Johnson's hospitalization. Dr. Weaver testified that Johnson had experienced the same psychotic pattern of hearing voices, having Bible verses run through his mind, and having beliefs about voodoo, during the night of the offenses, and that this pattern had been well documented in his medical records.
 {¶ 30} During cross-examination, Dr. Weaver admitted that Johnson was able to formulate a plan to cause his death and that he had taken steps to carry out this plan. However, Dr. Weaver testified that, in his opinion, Johnson's ability to formulate a plan, as well as to express his concern for his cousin and his cousin's children, did not necessarily mean that Johnson was sane at the time of the offenses. Dr. Weaver testified that people who were psychotic could and did make plans, and that they still had some vestiges of conscience and consideration for others. Likewise, Dr. Weaver stated that he did not believe that Johnson's knowledge of the police and his awareness of the situation meant that he was able to discern the wrongfulness of his actions.
 {¶ 31} Dr. Weaver dismissed the state's assertion that Johnson could not have relapsed so suddenly given the fact that he had just been hospitalized for seven days prior to the standoff and that hospital records indicated that he had been medically compliant at the time of his release. Weaver stated that, without blood levels being taken, there was no way to know if Johnson had really taken his medication during his hospitalization. He further stated that because Johnson had been noncompliant for two months prior to his hospitalization, the one week that Johnson had been hospitalized would not have made that much difference in the acuteness of his illness.
 {¶ 32} Dr. Chiappone testified that he had examined Johnson in March 2000, at which time he had found Johnson to be incompetent to stand trial. Dr. Chiappone testified that he also examined Johnson in July 2001 for purposes of determining his mental state at the time of the charged offenses. Dr. Chiappone testified that Johnson was religiously delusional during the July interview. Dr. Chiappone stated that Johnson had talked about voodoo and blood on a pillow that was somehow related to voodoo. Johnson told Dr. Chiappone that he had been in a religious cult and that voodoo was going to protect him, but he could not articulate how this would occur.
 {¶ 33} When Dr. Chiappone asked Johnson about the charged offenses, Johnson told Dr. Chiappone that he had been studying the Bible for days and that he had been hearing Bible verses as well as voices telling him to kill himself. Johnson stated that he felt he was cursed and that somehow he had to commit suicide. Johnson explained that while this did not make total sense to him, he knew it was what he needed to do. So Johnson told Dr. Chiappone that he decided to call the police and somehow have the police help him to commit suicide.
 {¶ 34} Johnson stated that he told his cousin to leave his residence, and then he called for emergency assistance. When the police arrived, Johnson told Dr. Chiappone, he fired his gun out the window so the police would fire back at him. Johnson stated that he was able to avoid getting shot and also to avoid the effects of the tear gas, because he had been in the military and he knew how to protect himself. Johnson told Dr. Chiappone that he was able to keep the police at bay overnight. When Dr. Chiappone asked Johnson why he had not come out of the house, Johnson replied that voodoo was protecting him.
 {¶ 35} Dr. Chiappone testified that, in his opinion, Johnson had a delusional disorder and paranoid schizophrenia, both of which were severe mental illnesses. Dr. Chiappone based his diagnosis on the fact that Johnson had not had any history of psychiatric problems prior to 1998 and that he had been rapidly deteriorating thereafter. Dr. Chiappone also stated that Johnson had a history of not taking his medication and had also been probated, which implied a marked deterioration and a need for authorities to be involved in his life.
 {¶ 36} Dr. Chiappone further testified that, in his opinion, Johnson did not have the capability to discern right from wrong at the time of the charged offenses because he had been religiously delusional. Dr. Chiappone based his opinion on Johnson's statements, Johnson's medical history, and information that he had received from collateral sources. Dr. Chiappone opined that Johnson was religiously delusional on the night of the offenses because he had been religiously delusional both prior to and after the charged offenses, and because Johnson's behavior on the night of the offenses conformed to a pattern of behavior that had been documented by treating sources and statements from Johnson's family. Dr. Chiappone stated that, in his opinion, Johnson would have never have committed the charged offenses if he had not been religiously delusional and had not felt compelled to commit suicide. Dr. Chiappone testified that, in his opinion, Johnson's noncompliance with his medication only made his symptoms more active and florid during the standoff.
 {¶ 37} During cross-examination, Dr. Chiappone, when questioned about Johnson's individual actions during the standoff, admitted that Johnson's behavior was logical. Dr. Chiappone explained, however, that delusional people still retained some ability to take care of themselves, to function, and thus to act logically. Dr. Chiappone stated that, in his opinion, the mere fact that Johnson was able to plan his suicide and carry out his plan did not mean that Johnson necessarily understood the wrongfulness of his actions.
 {¶ 38} On February 15, 2002, the trial court concluded in a written decision that Johnson had failed to prove by a preponderance of the evidence that he was not guilty by reason of insanity. The trial court found Johnson guilty on all twenty-eight counts and the accompanying firearm specifications. That same day, Johnson entered a plea of no contest to the escape charge. The trial court found him guilty of that offense. Johnson was sentenced accordingly.
 {¶ 39} In the first of his three assignments of error, Johnson now argues that he met his burden of proving the defense of not guilty by reason of insanity by a preponderance of the evidence and, therefore, that the trial court's rejection of the defense was against the manifest weight of the evidence.
 {¶ 40} When reviewing the validity of a conviction on the manifest weight of the evidence, we must examine the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.[1] In State v. Thompkins,[2] the Ohio Supreme Court explained that a manifest "[w]eight of the evidence [claim] concerns the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount ofcredible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effectin inducing belief."[3]
 {¶ 41} To succeed on his insanity defense, Johnson had to prove by a preponderance of the evidence that, as a result of a severe mental disease or defect, he did not know the wrongfulness of his acts.[4] The Ohio Supreme Court has stated that "[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of fact."[5] Thus, if the record demonstrates that the trial court, as the trier of fact, considered the insanity defense, the reviewing court should defer to the trial court's interpretation of the evidence.[6]
Moreover, a reviewing court should only reverse a trial court's judgment on the defense of insanity where the trial court was presented with overwhelming and uncontradicted evidence of the defendant's insanity, and where that evidence was arbitrarily ignored.[7]
 {¶ 42} Johnson argues that the trial court's decision ignored the testimony of Dr. Hawkins, Dr. Weaver, and Dr. Chiappone. Johnson contends that because all four expert witnesses had agreed that he suffered from a serious mental illness at the time of the charged offenses, and because three of the doctors had opined that he was insane at the time of the offenses, the trial court's decision finding him sane was against the manifest weight of the evidence. We disagree.
 {¶ 43} In its decision, the trial court acknowledged that all four experts had agreed that Johnson was suffering from a significant mental illness at the time of the charged offenses; that Johnson was probably not taking his medication at some time near the incident; that he had been showing signs of deterioration in acts and thoughts before the incident occurred; and that he may have been subject to some auditory hallucinations that were not of a command nature. The trial court further stated that Johnson had expressed to each of these experts that he was thinking of suicide, but that he was not able to take his own life; so Johnson had fashioned a plan to involve the police, which he believed would result in his death.
 {¶ 44} The trial court then stated that all of the experts had agreed that, at all times during the incident, Johnson knew where he was, what he was going to do, what he had done in preparation, and who the people were who had surrounded the residence and had attempted to gain entry. Each had also agreed that Johnson was fully aware that firing his weapon in the direction of the police could result in their being hit, and their firing back at him could have accomplished his stated goal at the time.
 {¶ 45} The trial court also acknowledged that three of the experts had opined that Johnson was not sane at the time of charged offenses because (1) Johnson's conduct was delusional, bizarre, and illogical; (2) Johnson was psychotic; and (3) Johnson had experienced a complete break from reality at the time of the offenses. The court then stated that while it "had no doubt that the medical experts honestly believe[d] the correctness of their opinions and [that it] ha[d] great respect for each of them, * * * there [wa]s no evidence in the record [to] support a conclusion that Johnson was not in touch with reality."
 {¶ 46} The trial court found that Johnson's "conduct demonstrated a clear understanding of who he was and what he was doing." The court went on to state that Johnson "was not struggling; he was not incoherent; and he was not being impulsive."
 {¶ 47} The trial court further stated, "In this case, preponderance does not equate with the greater number of witnesses on the issue. It equates with the reality, sophistication and enormity of the incident. The defendant must be held accountable for his conduct in this case. His awareness was total, his acts of preparation were rational, the execution of his plan was intelligent, and his goals were clear and unambiguous. He cannot escape the right of society to have his conduct sanctioned for acting in this illegal manner."
 {¶ 48} Here, the trial court did not ignore the testimony of Johnson's three experts; rather it chose to accord more weight to Dr. Tureen's testimony. The trial court acted within its discretion as the trier of fact when it chose to believe the testimony and expert opinion of Dr. Tureen that Johnson had fashioned a well-organized plan to involve the police and that Johnson's actions indicated that he understood the wrongfulness of his conduct. Having reviewed the record, we cannot say that the trial court's decision finding Johnson sane at the time of the offenses was against the manifest weight of the evidence. As a result, we overrule Johnson's first assignment of error.
 {¶ 49} In his second assignment of error, Johnson argues that the trial court erred by denying his motions for a judgment of acquittal on the attempted-murder counts. Johnson moved for an acquittal after the state's case-in-chief and after the end of his case. In each instance, Johnson, argued that the state had failed to prove that he had knowingly acted with the purpose of committing murder.
 {¶ 50} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Our standard for review for the denial of a Crim. R. 29 motion is the same as the standard of review for the sufficiency of the evidence.[8] To reverse a conviction for insufficient evidence, we must be persuaded, after viewing all the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[9]
 {¶ 51} Johnson was charged with and convicted of attempted murder under R.C. 2903.02(B). R.C. 2923.02(A) provides, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." The committee notes to the statute provide that "purposely or knowingly attempting to commit a crime is sufficient to make the attempt a separate offense if the crime attempted requires knowledge, recklessness, or negligence for its commission.
 {¶ 52} Johnson was charged with attempted murder under R.C. 2903.02, which provides, "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."
 {¶ 53} The Ohio Supreme Court has held that the culpable mental state required to support a conviction under R.C. 2903.02(B) is the same one that must be proved to support a conviction for the underlying felony offense of violence.[10] In this case, the underlying felony offense of violence was felonious assault.[11] Felonious assault is defined by R.C. 2903.11(A)(2), which states that "no person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." Felonious assault is punishable as either a first-degree felony or a second-degree felony under R.C.2903.11(D).
 {¶ 54} So in this case, the trial court, as the trier of fact, had to determine if the state had proved beyond a reasonable doubt that Johnson had attempted to knowingly cause serious physical harm to the police officers and Reverend Sweet in such a way that it would have proximately resulted in their deaths.
 {¶ 55} Johnson claims that his attempted-murder convictions should be reversed because the state failed to demonstrate that he intended to harm Reverend Sweet or the police officers. Johnson argues that because all four expert witnesses testified that his sole motivation on the night of the charged offenses was to commit suicide, and because he merely fired shots toward the police officers, the state failed to show that he had knowingly acted with the purpose of committing murder. We disagree.
 {¶ 56} R.C. 2901.22(B) provides that "[a] person acts knowingly,regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." (Emphasis added.) Thus, contrary to Johnson's arguments, the state did not have to demonstrate Johnson's intent or purpose in order to secure his conviction for attempted murder under R.C. 2923.02(A).
 {¶ 57} Moreover, the trial court could have found that the state had proved the essential elements of attempted murder beyond a reasonable doubt. During the trial, Johnson stipulated to the underlying facts as set forth in the indictment, as well as to the state's exhibits. The state's exhibits demonstrated that bullets fired from Johnson's gun were found both in the area of the walkway where the entry team had attempted to enter Johnson's residence and on the deck located behind the residence. The state also presented testimony from Officer Malone that shots fired by Johnson ricocheted off the street and struck the embankment above his head. Johnson argues, however, that because the stipulated facts indicated that he only fired his gun toward the police officers rather than directly at them, his attempted-murder convictions should be reversed. We disagree. Johnson knew when he was firing shots out the window that if he hit someone, they would be killed.
 {¶ 58} Given this evidence, the trial court could have found that the state had proved beyond a reasonable doubt that Johnson had attempted to knowingly cause serious physical harm to the police officers and Reverend Sweet in such a way that it would have proximately resulted in their deaths. Because the evidence, when viewed in the light most favorable to the prosecution, did not reasonably support an acquittal on the attempted-murder charges, we overrule Johnson's second assignment of error.
 {¶ 59} In his third assignment of error, Johnson challenges the trial court's imposition of the maximum sentence on the escape charge. He contends that the trial court did not provide adequate reasons for why he posed the greatest likelihood of committing future crimes. Johnson further argues that the trial court's finding was not supported by the evidence. We disagree.
 {¶ 60} To impose the maximum prison term, a trial court must make one of four findings: (1) that the offender has committed the worst form of the offense; (2) that the offender poses the greatest likelihood of recidivism; (3) that the offender is a repeat violent offender; or (4) that the offender is a major drug offender.[12] In addition, the trial court must give reasons supporting its imposition of the maximum prison term.[13]
 {¶ 61} At the sentencing hearing in this case, the trial court orally stated that it had considered the provisions of R.C. 2929.11 and subsequent sections, the presentence-investigation report and attached documents, and the medical and clinical reports that had been prepared before trial, for trial, and for sentencing purposes. The trial court also acknowledged that Johnson had mental issues that adversely affected him, especially when he stopped taking his medication.
 {¶ 62} The trial court then proceeded to sentence Johnson for felonious assault and attempted murder. The trial court merged the attempted murder and felonious assault involving Reverend Sweet and imposed the maximum ten-year prison term for attempted murder. The trial court also merged the felonious assault and attempted murder of each of the thirteen police officers, and imposed the maximum ten-year prison term for attempted murder. The trial court then merged each of the twenty-eight gun specifications into one three-year sentence. The trial court then ordered the two ten-year terms and the three-year term to be served consecutively, for a total of twenty-three years.
 {¶ 63} On the felony sentencing worksheet, the trial court stated that it was imposing the maximum sentence because Johnson posed the greatest likelihood of recidivism. The trial court noted that Johnson had "jeopardized [a] SWAT team of thirteen police officers and a civilian minister, whom he shot in the leg through a car passing the scene." The trial court also orally stated that the maximum sentence was justified because "the physical harm suffered by the civilian, Reverend Cornell Sweet, and the threat of harm suffered to the 13 police officers [was] so unusual that a prison term of less than the maximum is inadequate." The trial court further stated that "everything that [Johnson] did during the nine-hour standoff showed a significant amount of preparation and skill, all of which compounds the danger this defendant poses to the community. The public truly needs to be protected from this type of conduct."
 {¶ 64} The trial court then orally stated that it was also imposing the maximum prison term for the escape for the reasons it had already given. The trial court further stated that "these maximum sentences [we]re being ordered to recognize that a shorter sentence would demean the seriousness of this defendant's conduct and would not adequately protect the public as it is obvious that unless he is locked up and administered his medication, he deteriorates quickly and has done so on more than one occasion. This is a matter in which the community has a right to be protected. Your medical problem is something that the court can have sympathy with, but the community should not have to be responsible for being concerned for their safety."
 {¶ 65} Because the trial court followed the felony sentencing guidelines when imposing the maximum sentence, we cannot clearly and convincingly conclude that the record does not support Johnson's sentence for escape, or that the sentence for escape is contrary to law. As a result, we overrule the third assignment of error. We, therefore, affirm the judgment of the trial court.
Judgment affirmed.
Sundermann, P.J., Hildebrandt and Gorman, JJ.
[1] State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
[2] 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citing Blacks Law Dictionary (6 Ed. 1990) 1594.
[3] Id.
[4] See R.C. 2901.05(A) and 2901.01(A)(14).
[5] State v. Thomas (1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356, syllabus; see also, State v. Filiaggi, 86 Ohio St.3d 230, 243,1999-Ohio-99, 714 N.E.2d 867.
[6] See State v. Curry (1989), 45 Ohio St.3d 109, 114,543 N.E.2d 1228.
[7] See State v. Brown (1983), 5 Ohio St.3d 133, 134-135,449 N.E.2d 449.
[8] State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[9] State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[10] State v. Miller, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, at ¶ 31-34.
[11] See R.C. 2101.01(A)(9), which defines felonious assault as an offense of violence.
[12] See R.C. 2929.14(C).
[13] See R.C. 2929.19(B)(2)(d); State v. Edmonson, 86 Ohio St.3d 324,328-329, 1999-Ohio-110, 715 N.E.2d 131.