[Cite as *State v. Walker*, 2017-Ohio-9255.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-150757 |
| | | TRIAL NO. B-1500422 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| DAMON WALKER, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: December 27, 2017

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}   Defendant-appellant Damon Walker was indicted for two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4).  Walker filed a motion to suppress the statement he made to police while held in the Hamilton County Justice Center, claiming that his statements were "involuntary because he did not have the capacity to waive his *Miranda* rights."  After two separate evaluations from the Court Clinic Forensic Services and a hearing on the matter, the trial court denied the motion.  Walker pleaded no contest to the charges, and the trial court found him guilty.  He was sentenced to five years in prison and provided notice of his duty to register as a Tier III sex offender.  In three assignments of error, Walker now appeals.

### The Hearing on the Motion to Suppress

{¶2}   During the hearing on the motion to suppress his statement, Cincinnati Police Detective Kimberly Kelley testified that she and Detective Iris Kelly had interviewed Walker on January 22, 2015.  Walker had recently been assaulted by a person who accused him of molesting a relative.  The detectives were already familiar with Walker from previous investigations in 2013 involving two different child victims.  Kelley also testified that Walker had previously been treated for competency restoration in the juvenile court before he was adjudicated for gross sexual imposition.

{¶3}   Walker's interview was conducted at the Hamilton County Justice Center while he was awaiting trial in an unrelated matter.  Detective Iris Kelly reviewed the notification of rights form with Walker, knowing that Walker had a "limited intellect."  She began by reading the rights form to Walker.  When she asked what that meant to him, he responded that he didn't know.  She said, "That means

2

that you can talk to us without a lawyer. Okay? That means that if you want - - if you want to stop talking to us, you can stop at any time. Okay? Do you understand that?" Walker said that he did. When she asked if he was sure, Walker confirmed that he understood.

{¶4} During the interview, Kelly used simple language to communicate with him, and he appeared to have no problem understanding the questions and providing logical responses. Walker was interviewed for less than two hours. During the course of the interview, Walker admitted taking the five-year-old nephew of his godmother into the bathroom of her apartment, removing his clothing, fondling his penis, and forcing him to fondle Walker's penis.

{¶5} The trial court also heard testimony from Dr. Carla Dreyer and Dr. Gail Hellmann of the Court Clinic Forensic Services. Both submitted reports opining that Walker was not competent to waive his *Miranda* rights. Dreyer had had previous contact with Walker during the course of Walker's juvenile proceedings. Four weeks before the detectives interviewed Walker at the Justice Center, Dreyer had concluded that Walker had been competent to stand trial in another matter.

{¶6} Prior to conducting the interview with Walker in preparation for the hearing in this case, Dreyer reviewed the "Receipt Confirmation of Forensic Participant's Rights Policy and Privacy Practices of Court Clinic and Informed Participation Statement" with Walker. Even though Walker had had a guardian ad litem appointed who was not present at the time, Dreyer concluded that Walker appeared to adequately understand the information such that Walker was capable of waiving his privacy rights. After being convinced that Walker understood his rights and the consequences of cooperating with the interview, Dreyer commenced her evaluation and administered the "Miranda Rights Comprehension Instruments" test.

3

{¶7} Dreyer interviewed Walker for about 30 minutes at the Justice Center. Dreyer indicated that Walker "has consistently minimized his history of contacts with the court system and the sexually-inappropriate behaviors." He had also been diagnosed with disruptive-behavior disorder, attention-deficit/hyperactivity disorder, a psychotic disorder not otherwise specified, impulse-control disorder, and oppositional-defiant disorder, and had been sexually abused as a child. Nonetheless, Walker had been denied assistance from the Hamilton County Developmental Disabilities Services because of Walker's "previous formal measurements of his adaptive functioning." After the evaluation was concluded, Dr. Dreyer concluded that Walker had not been competent to waive his *Miranda* rights at the time he was questioned, rendering his waiver unknowing and involuntary.

{¶8} Dr. Hellmann evaluated Walker five months after Dr. Dreyer. Hellmann interviewed Walker for less than an hour. She also reviewed the interview between Walker and the detectives. Hellmann concluded that Walker "had a tendency to acquiesce or provide statements [which] he perceived to be socially acceptable or desired by the questioner." Hellmann, like Dreyer, concluded that Walker had not been competent to waive his *Miranda* rights.

{¶9} In denying the motion to suppress, the trial court chose to reject the conclusions of Drs. Dreyer and Hellmann. The trial court said that

> With our case at hand, we have a situation where the defendant, while being interviewed was cunning enough to minimize his criminal record and has consistently done that. He was not medicated. He was only using sleep medication. He [has], in fact, been determined - - or deemed uneligible [sic] for DDS services.

4

He talks about - - to the doctors about the cops coming to see him. He remembers that and why they came to see him about touching his nephew. He remembers that the police told him he did not have to sign the *Miranda* waiver and that he could have an attorney with him. He indicates that he forgot to tell the police that he wanted a lawyer.

Despite all of that, and the fact that he has repeatedly been found competent after restoration to stand trial, the doctors had deemed him incompetent on a date that was about five months prior to their examination for *Miranda*.

He is able to understand all of the courtroom activities[,] all of the involvement of the parties, what his job is in the courtroom, what his lawyer's job is, the prosecutor, the judge, the various pleas that he could enter.

Throughout his interview, which was not lengthy. [sic] There is was [sic] one interview. The police officer spoke with him very softly, handled him very generally [sic]. He, throughout the interview, corrected the officer or denied things that they suggested. He was not simply endorsing what the police officers had said.

He denied touching his nephew's behind. He explained who Day-Day was. He knew the location of the apartment. He explained his conviction with a victim named [M.S.]. He denied having pulled the child into the bathroom.

He has prior criminal experience which is extensive. And the *Miranda* waiver is only a factor in the totality of the circumstances of

him understanding everything that was going on, the signature of the waiver.

Again, this was not a long interview. It was not intense. He was not deprived of anything. He was not mistreated. No inducements were made.

He knew he was talking to the police. He knew he did not have to talk. He knew he was in the Justice Center. He had been through the system multiple times.

There is nothing, frankly, that indicates that he did not understand the ramifications of signing the *Miranda* waiver. So I respectfully disagree with the doctors. And the motion to suppress is denied. Overruled.

**The Motion to Suppress Was Properly Denied**

{¶10} In his first assignment of error, Walker claims that the trial court improperly denied his motion to suppress his statement. Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Accepting those facts as true, the appellate court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. *Id.*

{¶11} In *Miranda*, the United States Supreme Court determined that, due to the coercion inherent in custodial police interrogation, certain procedural safeguards were necessary as prophylactic measures "to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966). Thus, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* After he is advised of his rights, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

{¶12} In this case, Walker argued below that his statement had been involuntary because he did not have the capacity to waive his *Miranda* rights. The basis for that argument was that Walker lacked the mental capacity, including the intellect, to knowingly, voluntarily, and intelligently waive his rights—an argument supported by the expert opinions of Drs. Dreyer and Hellmann.

{¶13} And so, there are two questions for this court to answer. First, we must determine if it was permissible for the trial court to reject the conclusions of the two experts who testified in this case. Second, if such a rejection was permissible, we must decide if there was competent, credible evidence to support the conclusion that Walker's intellect did not prevent him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights.

**The Expert Testimony**

{¶14} While a trial court cannot "arbitrarily" ignore an expert opinion, it may reach a contrary conclusion if there are "some reasons * * * objectively present" in the record to do so. *State v. Brown*, 5 Ohio St.3d 133, 135, 449 N.E.2d 449 (1983). Thus, an expert's opinion is not conclusive, even if uncontradicted by another expert. *Id.*; *see State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71 (holding that the trial court is not required to accept an expert's opinion when there is some objectively present reason for ignoring it).

{¶15}   In this case, the trial court had reasons objectively present upon which it could rely to reject the expert opinions below.  Just weeks before he was evaluated by Dr. Dreyer as to his "Competence to Waive Miranda Rights," Dreyer had filed a report in another matter that Walker was competent to stand trial.  In other words, just 36 days before, Dr. Dreyer had found that Walker understood the nature and objective of the proceedings against him and could participate in his own defense.  *See Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).  While the experts indicated that competence to stand trial and competence to understand the *Miranda* rights are not the same thing, Walker's ability to understand the trial process and assist in his defense is some evidence that he understood what was happening to him, the role of law enforcement, and that he could understand information about that process that was explained to him.

{¶16}   Particularly noteworthy was the fact that Dreyer, prior to interviewing Walker, had engaged him in a discussion in order to determine whether he could knowingly agree to the "Confirmation of Forensic Participant's Rights Policy and Privacy Practices of Court Clinic and Informed Participation Statement."  Dreyer concluded that Walker, in order to participate in the evaluation, was competent enough to waive his fundamental right to privacy.  And, even though Walker had a guardian to protect his interests, Dreyer went through the interview without either having the guardian review the form or having Walker sign it.  Dreyer had concluded that Walker was able to participate in that process, saying that she was comfortable interviewing Walker—even without his guardian present—because of his numerous prior contacts with the Court Clinic.

{¶17}   Similarly, the trial court could reasonably look at this determination, very similar to the determination of whether the *Miranda* waiver was knowing,

intelligent, and voluntary, when reaching its conclusion that Walker had validly waived his rights. The trial court also noted that Walker had had extensive experience with the criminal-justice system prior to the interview. The trial court mentioned that Walker was insightful enough to "minimize his criminal record and has consistently done so." And while Dr. Dreyer had indicated that she disagreed with its conclusion, the fact remained that the Hamilton County Developmental Disabilities Services agency had found Walker ineligible for their services due to "previous formal measurements of his adaptive functioning."

{¶18} On this record, we conclude that the trial court could reject the conclusions of the expert witnesses and make its own determination as to whether Walker's intellect precluded him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights.

### The Decision Was Supported by Competent, Credible Evidence

{¶19} We must now determine, absent the conclusions of the expert witnesses, whether there was competent, credible evidence upon which the trial court could rely when determining that Walker's waiver of his *Miranda* rights was knowing, voluntary, and intelligent. "[A] court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights." *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 9, citing *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 25, quoting *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996). By this definition of

"totality," a court is to look to all of the evidence to determine a suspect's understanding, which can be implied by his conduct and the situation. *Lather* at ¶ 9.

{¶20}    An individual's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights. *State v. Jenkins*, 15 Ohio St.3d 164, 233, 473 N.E.2d 264 (1984). Rather, a person's low intellect is but one of many factors under the totality of circumstances that a court must consider in assessing the voluntariness of a *Miranda* waiver or confession. *State v. Frazier*, 115 Ohio St.3d 139, 154, 873 N.E.2d 1263 (2007).

{¶21}    As the trial court noted, the detectives spoke plainly with Walker when explaining his rights. Both detectives had had previous contact with Walker while investigating two separate offenses involving other victims. Detective Kelly had previously explained Walker's *Miranda* rights to him. After the rights form was read to Walker, he was asked if he knew what it meant, and he said that he didn't know. Detective Kelly then summarized the rights for Walker, stating that they meant that "you can talk to us without a lawyer, or you can talk to us with a lawyer. Okay? That means that if you want to stop talking to us, you can stop at any time." Walker was then asked if he understood, and he said that he did. Kelly pressed him further, asking, "Are you sure?" Walker responded, "Yes, ma'am." After repeatedly telling the detectives that he understood his rights, he then agreed to speak with them.

{¶22}    The interview itself was not long, lasting less than two hours. He was not denied anything during the course of the interview, and he was not mistreated. While he was in the Hamilton County Justice Center at the time of questioning, he was being held there on a separate matter. He was 20 years old at the time, and had had numerous contacts with the justice system before that.

{¶23} It is worth noting that the trial court was able to not only read the cold transcript of the interview, but was also able to listen to the audio recording. The audio recording gives a different sense of the exchange than can be had from reading the words on the page. It is in situations like this when this court should give deference to the trial court's interpretation of such evidence. The trial court listened to the recording of Kelly reading the rights to Walker, Walker's response claiming he did not understand, and Kelly's explanation of the rights. On this record, the trial court's determination was supported by competent, credible evidence.

{¶24} The trial court concluded that there was "nothing, frankly, that indicates that he did not understand the ramifications of signing the *Miranda* waiver." In the context of this case, and having determined that the trial court permissibly rejected the opinions of the expert witnesses, this statement was accurate. While the experts reached a different conclusion, the trial court was not required to accept their opinions as long as other evidence in the record supported departing from their conclusions. *Compare State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 70 (the trial court failed to set forth any rational basis grounded in the evidence for rejecting the uncontradicted testimony of two qualified expert witnesses in the field of psychology). In this case, the trial court gave an extensive recitation of the evidence in the record to explain why it did not agree with the expert witnesses. Because the trial court's finding was supported by some competent, credible evidence, the trial court did not err when it denied his motion to suppress. We overrule Walker's first assignment of error.

### Content of *Miranda* Warning and Subsequent Explanation

{¶25} While the dissent has raised the issue of Detective Kelly's inadequate explanation of the *Miranda* rights during Walker's interview, Walker neither raised

that issue in the trial court, nor argued that issue to this court on appeal. During the course of the proceedings on the motion to suppress, Walker's counsel clearly limited the scope of his challenge to his "capacity to waive his *Miranda* rights," not their adequacy. After having presented the expert testimony, counsel argued only that the "State has the burden * * * of proving, by a preponderance of the evidence, that Mr. Walker's statement was voluntary. You have two experts who have both agreed independently that [it] was not." Counsel concluded by stating that "we ask that you accept and follow the opinions offered to you by the scientific experts in this regard."

{¶26} "It is well-settled law that issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived." *Columbus v. Ridley*, 2015-Ohio-4968, 50 N.E.3d 934, ¶ 28 (10th Dist.), quoting *State v. Barrett*, 10th Dist. Franklin No. 11AP-375, 2011-Ohio-4, ¶ 13; *see State v. Comen*, 50 Ohio St.3d 206, 211, 553 N.E.2d 640 (1990). This "well-settled law" applies to arguments not asserted either in a written motion to suppress or at the suppression hearing. *Id.*, citing *State v. Johnson*, 10th Dist. Franklin No. 13AP-637, 2014-Ohio-671, ¶ 14; *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 9; *State v. Perkins*, 9th Dist. Summit No. 21322, 2003-Ohio-3156, ¶ 13; *State v. Molk*, 11th Dist. Lake No. 2001-L-146, 2002-Ohio-6926, ¶ 11.

{¶27} Walker would not have been able to raise on appeal the issue of whether the warnings he received from Detective Kelly were adequate. And the appellate record demonstrates that he has not. Throughout his brief to this court, Walker continued to rely solely on Walker's mental capacity to understand his rights, as demonstrated by the expert testimony. Even in his third assignment of error, wherein Walker argues the ineffectiveness of trial counsel, he fails to assert that trial

counsel should have raised the issue of the inadequacy of the explanation of the *Miranda* rights.

{¶28} In a recent case from the Eleventh Appellate District, the court addressed a similar issue. *State v. Mock*, 11th Dist. Lake No. 2012-L-066, 2013-Ohio-874. In that case, the defendant had filed a motion to suppress based on his unlawful continued detention during a traffic stop. *Id.* at ¶ 4. On appeal, he argued for the first time that the search of a bag in the vehicle was improper. *Id.* at ¶ 7. The court began by noting that the failure to make an argument before the trial court in support of a motion to suppress "constitutes waiver of the defenses or objections." *Id.* at ¶ 8, citing Crim.R. 12(H). The court reasoned that

> by failing to advance these arguments in his suppression motion before the trial court, the state did not have notice of the issues and an opportunity to prepare its case. The trial court did not make any findings of fact on these points because the matters were not raised and there was no evidence placed before it at the suppression hearing. [Consequently], this appellate court is unable to conduct its ordinary standard of review as there are no factual findings upon which to defer and no application of law to apply.

(Citations omitted.) *Id.* at ¶ 9. The court then went on to reject the proposition that such an argument could be considered under a plain-error analysis.

> Notice of plain error is to be "taken with utmost caution and only to prevent a manifest miscarriage of justice[.]" However, we question the propriety of a plain error analysis in the context of a defendant's failure to make constitutional arguments in a suppression motion. Under appellant's line of reasoning, the trial court, to avoid the alleged

13

error in this case, would have been required to raise new suppression issues *on behalf of* appellant, request the parties to present evidence on those matters, and then evaluate the issues.

(Emphasis sic.) (Citation omitted.) *Id.* at ¶ 10.

{¶29} We agree with our colleagues in the Eleventh District that addressing an argument not raised below in support of a motion to suppress, even under plain error, would be inappropriate. But even if we were to consider it in the context of plain error, Walker would not succeed. For an error to constitute "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶30} In this case, we would not be able to say that any error was an obvious defect in the trial proceedings. Generally, when a suspect receives an incomplete reading of the *Miranda* warnings, courts have held that subsequent statements are not admissible. *See California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). But this is not a case where the only information given to the suspect was an incomplete reading of the rights. The incomplete explanation had been preceded by a complete reading of the rights. This court has not found a case with a fact pattern similar to the case at bar, though courts have held that an incomplete rewarning is not deficient when it has been preceded by a complete warning. *See, e.g.*, *State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 729 (2001) (holding that partial rewarning was sufficient in light of the arresting officer's earlier warning that had occurred just two hours before). Thus, even if this court were inclined to engage

in such an analysis, without a bright-line rule that would have clearly demonstrated an obvious defect, we could not have concluded that the failure to sua sponte grant a motion to suppress based on grounds that had not been argued rose to plain error.

{¶31} We overrule Walker's first assignment of error.

### Tier III Offender Classification

{¶32} In his second assignment of error, Walker claims that he was improperly classified as a Tier III sex offender. The state concedes that Walker should have been classified as a Tier II sex offender. We agree.

{¶33} As a juvenile, Walker had been classified as a Tier I offender for a previous incident of gross sexual imposition. However, at the hearing below, the trial court concluded that the juvenile court had not had the authority to classify Walker as a Tier I offender. As a result, the trial court determined that Walker had actually been a Tier II offender. Thus, the trial court classified Walker as a Tier III offender in this case.

{¶34} This court has previously held that the juvenile court has discretion to classify juvenile offenders, like Walker, who commit gross sexual imposition as Tier I offenders. *See In re A.C.*, 182 Ohio App.3d 237, 2009-Ohio-2567, 912 N.E.2d 182, ¶ 13. Therefore, the trial court should have classified Walker as a Tier II offender in this case. *See* R.C. 2950.01(F)(1)(j). We sustain Walker's second assignment of error.

### Assistance of Counsel

{¶35} In his third assignment of error, Walker claims that counsel was ineffective to the extent that counsel failed to properly preserve the record below to allow for appellate counsel to fully argue the first two assignments of error. He first argues that trial counsel was deficient for failing to argue that the waiver was not

knowing or intelligent, having raised only the issue of voluntariness. But, as the state concedes, it did not believe that the motion to suppress "was in any way insufficient to preserve the issues raised in his first assignment of error. The trial court clearly considered whether Walker's waiver of his *Miranda* rights was done knowingly, intelligently, and voluntarily." We agree with this analysis, and have considered whether Walker's mental capacity rendered his waiver unknowing, unintelligent, or involuntary within the context of his first assignment of error.

{¶36} We also conclude that the record below was sufficient for counsel to raise the issue of his improper classification, an error which the state concedes. Thus we have considered this argument within the context of the second assignment of error.

{¶37} Since we have addressed the substance of the arguments in both assignments of error, trial counsel was not ineffective for failing to preserve them for our review. We overrule Walker's third assignment of error.

### Conclusion

{¶38} The portion of the trial court's judgment classifying Walker as a Tier III sex offender is reversed, and this cause is remanded to the trial court with instructions to classify Walker as a Tier II sex offender, after providing him with the appropriate notifications relevant to that classification. The trial court's judgment is affirmed in all other aspects.

Judgment affirmed in part, reversed in part, and cause remanded.

CUNNINGHAM, J., concurs.
ZAYAS, J., dissents.

ZAYAS, J., dissenting.

{¶39} I concur with the majority's conclusion that Walker's waiver of his

*Miranda* rights was voluntary. However, based on this record, the evidence overwhelmingly demonstrates that Walker did not have the intellectual capacity to understand or appreciate the significance of his *Miranda* rights, and the trial court arbitrarily ignored the experts' testimony. I therefore respectfully dissent.

**The Expert Reports**

{¶40} The trial court appointed two Court Clinic Forensic Services experts to evaluate Walker. Dr. Dreyer was appointed at the request of the defense, and Dr. Hellmann was appointed at the request of the state. The state stipulated to the experts' qualifications.

{¶41} Dreyer described Walker as an immature, simplistic person who is often very childlike. Hellmann stated that he appears to have microcephaly, and his cognitive disorder has caused communication deficits, limited vocabulary, and an inability to understand abstract ideas.

{¶42} Walker has a history of learning disabilities, special education classes, participation in Individualized Education Programs, and difficulty reading. He has long been involved with mental-health services at The Children's Home, Altercrest, St. Joseph's Orphanage, Mental Health Access Point, Summit Behavioral Healthcare ("SBH"), and Cincinnati Children's Hospital Medical Center. His numerous diagnoses include psychosis, major-depressive disorder, disruptive-behavior disorder, mild or moderate mental retardation, mixed-expressive-receptive-language disorder, oppositional-defiant disorder, impulse-control disorder, attention-deficit/hyperactivity disorder, and kleptomania. He is also a victim of child sexual abuse.

{¶43} In addition to her evaluation of Walker's ability to understand his *Miranda* rights, Dreyer had evaluated Walker several times in the past four years,

administering various tests to gauge his intellectual and cognitive abilities. In previous evaluations, Walker completed the "Test of Memory Malingering" to determine if he were feigning or exaggerating his memory problems. In that evaluation, Walker's score was consistent with individuals with brain injuries, aphasias, dementia, and other types of cognitive impairments, and inconsistent with an individual who was feigning or exaggerating his memory deficits.

{¶44} Under the Weschler Adult Intelligence Scale, Walker's full scale IQ was 59, placing him in the first percentile. He scored in the first percentile for verbal comprehension, the second percentile for perceptual reasoning, the first percentile for working memory, and the first percentile for processing speed. The scores indicated that his verbal reasoning, perceptual reasoning, and ability to use information, concentrate, and process information are in the extremely low range.

{¶45} Dreyer also administered the "Wide Range Achievement Test" to assess his academic abilities. Walker's score on the word reading subtest was below the first percentile, as was his score on the sentence comprehension subtest and his reading composite score. He scored in the fourth percentile for spelling and the second percentile for math.

{¶46} Both experts administered the "*Miranda* Rights Comprehension Testing," ("MCRI") to determine Walker's capacity to understand and waive his rights. The MCRI is a set of four instruments designed to assist in the determination of a defendant's capacity to understand and appreciate the significance of his or her *Miranda* rights. Both experts noted that the MCRI tests are objective, standardized tests with no subjective component to their scoring.

{¶47} The "Comprehension of *Miranda* Rights-II" assesses an examinee's understanding of the basic meaning of each of the five *Miranda* warnings. Each

warning is presented individually, and examinees are asked to explain the meaning of each warning in their own words. Walker scored 2 out of 10 both times he was tested, which is just below the third percentile and indicates significant deficits in understanding *Miranda* rights.

{¶48} The "Comprehension of *Miranda* Rights-Recognition-II" assesses an examinee's *Miranda* understanding, omitting the role of verbal expressive abilities in the assessment. Each warning is presented, and after each, the examinee is read other statements and must recognize whether each statement has the same meaning as the *Miranda* warning. When Dreyer tested Walker, he answered 10 out of 15 correctly, which is just below the fifth percentile, indicating an impaired ability to understand the warnings. He scored 8 out of 15 when Hellmann tested him.

{¶49} The "Function of Rights in Interrogation" test is a structured interview with visual stimuli, designed to assess an examinee's understanding of the nature of interrogation, the significance of the right to counsel, and the significance of the right to silence. Examinees are presented with illustrations accompanied by a brief scenario and related questions. When Dreyer administered the test, Walker's overall score was 14 out of 30, which is at the first percentile, indicating a significant impairment in the ability to understand his rights. Walker's score on the nature of interrogation was an 8 of 10, just below the twenty-second percentile, indicating a general understanding of interrogation. However, on the right to counsel subscale, Walker scored 4 out of 10, in the first percentile, indicating deficits in his understanding of the function of legal counsel. On the right to silence subscale, which tests an individual's understanding of the protections of the warning and the role of a confession, Walker scored 2 out of 10, at the second percentile. When Hellmann tested him, Walker's overall score was 19 out of 30, which is in the fifth

percentile. Again, Walker scored better on the nature of interrogation subpart, but performed poorly regarding the function of legal counsel, the protections related to the right to remain silent, and the role of confessions.

{¶50} Finally, Walker completed the "Comprehension of *Miranda* Vocabulary-II," designed to measure his understanding of the vocabulary associated with *Miranda* rights. When Dreyer tested him, Walker obtained a score of 5 out of 32, which is at the second percentile, indicating significant difficulties understanding basic *Miranda* terms. When Hellmann tested him, he scored 14 out of 32, which is in the fifth percentile.

{¶51} Both reports discussed Walker's tendency to acquiesce to the police during the interrogation. As Hellmann's report summarized:

 The defendant had a tendency to acquiesce to detectives during the questioning, resulting in him providing many confusing and conflicting statements. His friendly bantering and chuckling during portions of the interview suggest that he was not cognizant of the adversarial nature of the roles of the detectives during questioning, and was not adequately concerned with the perils and consequences of disclosure during the interview. * * * Rather, he seemed to have been more concerned with making sure he did not miss lunch.

{¶52} Dreyer reached a similar conclusion:

A review of the defendant's interrogation with police suggests that the defendant may have been trying to be compliant with police.

* * *

[The] pattern of acquiescence [in intellectually disabled individuals] * * * may lead to problems in a police interrogation.

20

Specifically, it often leads to defendants responding affirmatively to questions, regardless of their context or nature, as a means to avoid conflict with authority.

It is noted that [Walker] appears to have lacked the appropriate understanding and appreciation of his *Miranda* rights at the time of his interrogation. Further, his personality characteristics, coupled with his intellectual limitations, appear to have interacted with the police interrogation efforts and contributed to his confession.

{¶53} Both experts agreed to a reasonable degree of psychological certainty that Walker did not have the intellectual capacity to waive his *Miranda* rights because he lacked the ability to understand his rights and to appreciate the consequences of waiving those rights. Dreyer further opined that Walker had little understanding of the negative consequences of speaking with the police and believed police officers were there to help him if he provided them information.

### Walker's Interrogation

{¶54} In addition to extensively testing Walker, both experts reviewed and considered the audio of the interrogation. Two detectives interviewed Walker: Detective Iris Kelly, who administered the warnings, and Detective Kimberly Kelley. Kelly did not testify at the hearing on the motion to suppress, but Kelley did.

{¶55} After Kelly read Walker the *Miranda* warnings, she asked Walker to explain what they meant. He responded, "I don't know." Then Kelly gave Walker the following additional explanation: "That means that you can talk to us without a lawyer, or you can talk to us with a lawyer. Okay? That means that if you want, if you want to stop talking to us, you can stop at any time. Okay? Do you understand that?" Walker stated, "Yes ma'am," and then signed the acknowledgement form.

21

**The Expert Testimony**

{¶56} Both experts unequivocally testified that Walker did not have the intellectual capacity to understand his rights or appreciate the consequences of waiving his rights. Through rigorous cross-examination, the state attempted to undermine the experts' opinions. The state tried to show a discrepancy between the opinion that Walker was competent to stand trial one month prior to the interrogation and the opinion that he was not competent to understand the *Miranda* warnings four months after the interrogation. However, both experts repeatedly testified that competency to stand trial is distinct from competency to understand *Miranda* rights, and that one can be competent to stand trial without being competent to understand and waive *Miranda* rights, and Dreyer testified that the timing of the evaluations was not an issue. Dreyer also explained that the length of time between the interrogation and the *Miranda* testing was not relevant, because Walker's cognitive functioning and mental retardation were unlikely to change over time. There is no evidence to contradict the experts' opinions on this matter.

{¶57} The prosecutor specifically discussed Walker's ability to understand the courtroom proceedings, the roles of the judge, prosecutor, and defense counsel, the charges, and the available pleas, and suggested those factors undermined the experts' conclusions. However, both experts repeatedly testified that the determination of competency to stand trial assesses different criteria than the ability to understand *Miranda* warnings, and Dreyer reiterated that Walker's competency to stand trial had no effect on "the fact that he didn't understand fundamental rights because he doesn't understand the rights related to the interrogation or the *Miranda* warnings."

{¶58} In response to the prosecutor's suggestion that Walker's ability to correct the officers and not simply endorse the officer's statements were relevant

factors, Dreyer again testified they were not relevant to the *Miranda* inquiry. The only relevant issue was whether Walker had the capacity to understand his rights and the consequences of waiving those rights, and Walker did not.

{¶59} Additionally, both experts noted in their reports and in their testimony that, while the officers behaved appropriately during the interrogation, Walker's behavior indicated a willingness to acquiesce to the officers and a failure to understand the gravity of the circumstances. The state did not introduce any evidence to contradict their conclusions.

### The Layperson Testimony

{¶60} The sole witness for the state was Detective Kelley, who participated in the interrogation and was present when Kelly read Walker his rights. Kelley acknowledged that she was aware that Walker had been designated possibly mildly mentally retarded, and that both detectives were on notice that Walker was slow and previously had been found incompetent to stand trial.

{¶61} Kelley testified that she did not know whether Kelly had previously interrogated Walker, but that she had *Mirandized* and interrogated Walker in 2013. However, Kelley did not testify that Walker had waived his rights or signed a written waiver before making those statements. And, in the 2013 case, Walker was found incompetent to stand trial several times and went through a lengthy restoration period. It is unclear from the record whether Kelley interrogated him before or after he was found competent to stand trial. Equally important, Walker did not challenge whether his *Miranda* waiver was knowing and intelligent in that case.

{¶62} Kelley also stated that she was familiar with Walker's criminal history. The state introduced the records of Walker's adult criminal history, and she confirmed his history. However, the state elicited no testimony from her regarding

23

his prior criminal history.

{¶63} Finally, Kelley initially testified that she "tried to use simple language" when speaking to Walker, but later conceded that she used the same words with Walker that she would use with anyone else. Kelley also testified that it appeared to her that Walker understood his rights and their questions during the interrogation. However, Dreyer specifically testified that she did not agree with Kelley's opinion. And both experts concluded, after objective testing, that Walker did not understand his *Miranda* warnings. The state did not offer any evidence to refute Dreyer's expert opinion or the experts' objective test results. Additionally, the state did not introduce any evidence to support Kelley's subjective, lay opinion.

### Standard of Review

{¶64} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. An appellate court accepts the trial court's findings of fact if they are supported by competent and credible evidence, but must review de novo the application of the relevant law to those facts. *Id.*

### The Trial Court Impermissibly Ignored the Expert Testimony

{¶65} The majority states that expert testimony may be disregarded "if there are 'some reasons * * * objectively present' in the record to do so." *Brown*, 5 Ohio St.3d 133 at 135, 449 N.E.2d 449; *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 71. However, the question is whether the objective reasons are grounded in the evidence and sufficient to undermine and discredit the testimony of the qualified experts. *See White* at ¶ 70. The trial court may not disregard credible and uncontradicted expert opinions in favor of the perceptions of lay persons or the

court's own expectations. *Id.* at ¶ 74. Other courts have concluded that

> [i]n assessing the factfinder's decision to disregard the experts' opinion, a reviewing court should consider:
>
> (1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;
>
> (2) possible bias in the expert's appraisal of the defendant's condition;
>
> (3) inconsistencies in the expert's testimony, or material variations between experts; and
>
> (4) the relevance and strength of the contrary lay witness testimony.

(Footnotes omitted.) *Strickland v. Francis*, 738 F2d. 1542, 1552 (11th Cir.1984), citing *Brock v. United States*, 387 F.2d 254, 257-258, (5th Cir.1967), quoting *Mims v. United States*, 375 F.2d 135, 143, (5th Cir.1967) (Footnotes omitted.) *See White* at ¶ 85 (holding that the trial court abused its discretion "by rejecting well-supported expert opinion [ ] without any evidence to the contrary").

### 1. The correctness and adequacy of the facts upon which the doctors relied

{¶66} Both experts examined and tested Walker extensively and reviewed his past history, including his previous criminal history. Both concluded, to a reasonable degree of medical certainty, that Walker was mildly mentally retarded and did not have the intellectual capacity to knowingly understand or waive his *Miranda* rights. Both doctors administered the MCRI, an objective, standardized test, to conclude that Walker lacked the ability to understand or appreciate the *Miranda* warnings. Notably, their conclusions were based on objective testing and not based on Walker's subjective statements or descriptions of his mental capacity.

{¶67} Both experts also reviewed the audiotape of the interrogation and noted that after Kelly read him all of his rights, Walker was asked to explain the

meaning of his rights. When Walker responded that he did not know, Kelly gave an additional explanation that was very limited. Walker was only informed of his right to have an attorney present while speaking to the officers, and his right to stop talking to them whenever he wanted. This explanation did not inform him of his right to remain silent—that is, to not talk at all—nor did it include two other required components of the *Miranda* warnings: (1) that anything he said could be used against him; and (2) that a lawyer would be appointed if he could not afford one. Dreyer concluded that this exchange was too limited to establish that Walker understood the information Kelly had read to him.

{¶68} The state presented no reason to disregard the testimony of the experts which was based on objective testing and Walker's well-documented history and deficiencies. The state presented no evidence that the reports lacked an adequate factual basis or that the doctors made inaccurate assumptions. Therefore, this factor weighs against the trial court's decision to disregard the experts' opinions.

## 2. Possible bias in the experts' appraisals

{¶69} Both experts were appointed by the trial court and were employees of the Court Clinic Forensic Services. As Court Clinic employees, their psychiatric examinations were ordered by the court specifically to assist the court in making a proper determination. Both experts were qualified and competent to render professional opinions, and nothing in the record suggests any bias. The state stipulated that both experts were qualified, and the trial court did not make any findings challenging the experts' qualifications or competency. This factor also weighs against the court's decision to ignore the experts' findings and conclusions.

### 3. Inconsistencies in the expert's testimony, or material variations between experts

{¶70} The only expert testimony in this case was by the two appointed experts who agreed to a reasonable degree of medical certainty that Walker was intellectually incapable of understanding his *Miranda* rights. Both submitted detailed reports supporting their conclusions, discussed their findings and conclusions, and unequivocally testified that Walker was not capable of a making knowing and intelligent waiver of his *Miranda* rights.

{¶71} As previously noted, the state unsuccessfully attempted to suggest inconsistencies through cross-examination. However, both experts remained confident in their opinions and conclusions, and the state did not reveal any inconsistencies within the reports or between the experts.

{¶72} The state presented no conflicting testimony to undermine the experts' opinions. This is not a case where the trial court heard dueling experts dispute the findings of Dreyer and Hellmann or contradict their conclusions that Walker's intellectual limitations prevented him from understanding the *Miranda* rights and the consequences of waiving his *Miranda* rights. The only expert testimony presented concluded that Walker was intellectually incapable of knowingly and intelligently waiving his *Miranda* rights. This factor also does not support the trial court's disregard of the experts' opinions.

### 4. Relevance and strength of the contrary lay witness testimony

{¶73} Kelley's testimony was insufficient to undermine the experts' uncontroverted opinions that Walker did not knowingly or intelligently waive his *Miranda* rights. Most of her testimony was a recitation of the historical facts based on the interrogation and her knowledge of Walker, and was irrelevant to whether Walker knowingly waived his rights. Although she testified that she believed Walker

27

understood his rights and all of the questions he was asked during the interrogation, her subjective opinion was refuted by Dreyer's expert testimony, the experts' objective testing, and the experts' opinions based on the audiotape of the interrogation.

### This Record Contains no Reason to Disregard the Experts' Opinions

{¶74} This record is devoid of any objective reasons to support the trial court's decision to disregard the experts' reports and testimony. The record lacks any testimony that would allow the court to disregard the experts' opinions, and none of the factors that would justify ignoring the experts are present. The experts' reports and testimony were not challenged or contradicted by the state or the court.

{¶75} The trial court gave no explanation as to how the court evaluated the experts' opinions or why those opinions were completely disregarded. The court made no findings that the experts lacked credentials or credibility. The judge's failure to make any reference to the reports or any findings based on objective evidence to disregard the experts' opinions, suggests the court substituted its own subjective judgment in making its determination. Therefore, the trial court's decision to ignore the expert opinions of two court-appointed experts and their objective test results and substitute its own judgment was arbitrary and not supported by any objective evidence in the record. *See White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 74.

### The Trial Court Findings were not Supported by the Record

{¶76} Several of the trial court's findings of fact are not supported by any evidence. The trial court stated that Walker was "cunning enough to minimize his criminal record," but there is no objective evidence in the record to support this

finding of fact. Objective testing demonstrated that Walker had memory issues consistent with cognitive impairments, and inconsistent with deliberate malingering. Both experts agreed that Walker was a poor historian. Neither indicated that his minimization of his criminal history was deliberate, and there was absolutely no evidence in the record indicating that Walker was "cunning." In fact, a review of the interrogation and expert reports gives the opposite impression.

{¶77} Furthermore, while the trial court noted that Walker "remembers that the police told him he did not have to sign the *Miranda* waiver," a review of the interview reveals that the officers never told him that he did not have to sign the waiver. Walker's false memory further supports the experts' opinion that Walker is a poor historian who was not deliberately minimizing his criminal record.

{¶78} The trial court also stated that Walker was "not medicated" and only using "sleep medication." However, the record demonstrates that Walker told the officers he was taking Risperdal, an antipsychotic, and Dr. Hellmann's report confirmed this.

{¶79} While the trial court correctly noted that Walker had been deemed ineligible for Developmental Disabilities Services ("DDS") years earlier, the state presented no evidence, and the court made no finding, regarding the relevance of that fact. The record contains no evidence that the denial of services years earlier affected Walker's ability to understand his *Miranda* rights in 2014. And Dreyer testified that Walker's ineligibility was based on old assessments made when Walker was much younger, and that DDS had repeatedly refused to reassess him. Moreover, Dr. Dreyer disagreed with DDS's assessment after looking at their testing, and both experts concluded Walker was incapable of understanding his rights despite the DDS ineligibility.

{¶80} Many of the trial court's findings were discounted by the experts or

29

were not relevant to the question of whether the waiver was knowing and intelligent. The trial court found that Walker was able to tell the doctors mostly accurate information about the police interrogation, yet both experts explained that Walker's limited memory of the interrogation was inconsequential to his ability to understand the *Miranda* warnings. The trial court found that the officers were gentle during the interrogation, yet Dreyer testified that the gentleness of the officers had no impact on the fact that Walker did not understand his fundamental rights.

{¶81} The trial court's belief that the competency findings supported a conclusion that Walker knowingly and intelligently waived his *Miranda* rights was repudiated by both experts numerous times. Absent any evidence by the state to contradict the experts, the trial court's finding was not supported by the record. The court was also persuaded by the fact that the competency report was completed one month before the interrogation and the *Miranda* competency evaluations were done four months after the interrogation. Again, both experts testified that the timing of the *Miranda* evaluation was irrelevant to their conclusions that Walker did not have the intellectual capacity to understand his rights. Thus, the trial court's findings on these issues do not comport with the evidence in the record, and improperly discounted the experts' opinions.

{¶82} The trial court found that Walker had an extensive criminal history. Walker had been charged with at least 28 juvenile offenses, had been adjudicated delinquent in nine cases, found to be unruly in one case, and had been found incompetent to stand trial in several cases. Of the nine adjudications, Walker did not raise the issue of incompetence in any of those cases, admitted to eight of the charges, and was represented by counsel in one of those cases. The criminal history is accurate, but it is unclear how that fact pertains to Walker's intellectual capacity to waive his *Miranda* rights.

30

{¶83} The state presented no testimony tying Walker's prior criminal history to his ability to understand his rights, and the trial court made no finding as to why his prior criminal history supported its conclusion that the waiver was knowing and intelligent. Regardless, both experts were aware of Walker's prior criminal history and still concluded to a reasonable degree of psychological certainty that he did not have the intellectual capacity to knowingly and intelligently waive his *Miranda* rights.

### Waiver of *Miranda* Rights

{¶84} To determine whether a suspect knowingly, intelligently, and voluntarily waived his *Miranda* rights, courts examine the totality of the circumstances. *State v. Clark,* 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). The waiver inquiry has two dimensions: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Edwards v. Arizona*, 415 U.S. 477, 482, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1981). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.*

{¶85} In this case, the record supports the trial court's conclusion that Walker's waiver was voluntary. The interview was not lengthy, and the police officers did not intimidate, coerce, or deceive Walker. Thus, the sole issue is whether Walker had the intellectual capacity to knowingly and intelligently waive his *Miranda* rights.

{¶86} A suspect's waiver of his or her *Miranda* rights "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421,

106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 44. If a suspect acts "in such a way as to reasonably alert the interrogating officer that the warnings given have been misapprehended, the officer must, before any further questioning, insure that the suspect fully understands his constitutional privilege against self-incrimination * * *." *State v. Jones*, 37 Ohio St.2d 21, 306 N.E.2d 409 (1974), syllabus.

{¶87} To intelligently and knowingly waive *Miranda* rights, one must, at the very least, understand the words used in the warnings, what the rights encompass, and the consequences of waiving those rights. *State v. Lynn*, 7th Dist. Belmont No. 11 BE 18, 2011-Ohio-6404, ¶ 22. "An individual's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights." *Id.* at ¶ 14, citing *State v. Jenkins*, 15 Ohio St.3d 164, 233, 473 N.E.2d 264 (1984).

{¶88} The state bears "a heavy burden" to demonstrate by a preponderance of the evidence that the accused "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" before speaking to the police. *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 23, quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602, 16 L.Ed.2d 694. There can be no presumption that the defendant understood the rights, nor can the burden be placed on the defendant to show a lack of capacity. *Tague v. Louisiana*, 444 U.S. 469, 469-471, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (per curiam).

### Walker Did Not Receive a Complete *Miranda* Warning

{¶89} The record establishes that Walker was not provided a full explanation of his rights. When a suspect indicates that he or she does not understand, as Walker did, the officer must "insure that the suspect fully understands his constitutional privilege against self-incrimination." *Jones*, 37 Ohio St.2d 21, 306 N.E.2d 409, at

syllabus. As both experts noted, the detective provided an incomplete explanation of the *Miranda* rights after Walker indicated he did not understand his rights.

{¶90} A condition precedent to waiving one's *Miranda* rights is that all of the *Miranda* warnings were provided. *See Miranda*, 384 U.S. at 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (explaining that "[a]fter such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."); *State v. Williams*, 38 Ohio App.2d 67, 69, 313 N.E.2d 17 (1st Dist.1973) (concluding that the "failure to give the required constitutional warnings results in a per se inadmissibility of inculpatory statements made in response to custodial interrogation, regardless of the fact that the statement may be truly voluntary").

{¶91} Even where a subset of the *Miranda* warnings are properly provided, the remainder cannot be inferred due to other factors, such as the prior experience or prior criminal history of the defendant, as this would completely undermine the purpose and intent of the *Miranda* warnings. *United States v. Street*, 472 F.3d 1298 (11th Cir.2006) (holding that statements the defendant made to police after receiving incomplete oral *Miranda* warnings should have been suppressed, and that the trial court was wrong to imply that defendant's 20 years of experience as a police officer would mean he was not entitled to fully adequate warnings); *United States v. Bland*, 908 F.2d 471, 474, (9th Cir.1990), fn. 1 ("We likewise reject the government's suggestion that because Bland had prior experience with the criminal system, he knew of his rights and did not have to be given a complete warning.").

{¶92} Without a complete explanation of all of his rights, Walker could not have fully understood the consequences of abandoning his rights. While the majority

is correct that Walker did not raise this issue below, the adequacy of the *Miranda* warnings was a factor that both experts considered in determining that Walker's waiver was not knowing and intelligent. Moreover, the determination of whether a waiver is knowing and intelligent is "made upon an inquiry into the totality of the circumstances surrounding the interrogation," including the suspect's "age, experience, education, background, and intelligence" as well as "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Thus, the adequacy of the warnings given to Walker is a factor to be considered in determining whether the waiver was knowing and intelligent.

**The Motion to Suppress was Improperly Denied**

{¶93} In this case, the trial court erred when it arbitrarily discounted the experts' uncontroverted testimony that Walker did not have the intellectual capacity to knowingly or intelligently waive his rights. The trial court failed to set forth any basis supported by the evidence to reject the uncontroverted testimony of two qualified experts.

{¶94} The majority determined that the trial court was justified in rejecting the expert opinions because Walker was competent to stand trial, understood the courtroom proceedings, and could participate in his own defense. However, Dreyer was specifically asked about those factors and repeatedly testified that those factors were not relevant to Walker's intellectual capacity to understand his *Miranda* rights. Dreyer's testimony, which was supported by Hellmann's testimony, was unrefuted. Therefore, the trial court's reliance on these irrelevant factors was arbitrary, especially in light of the objective testing conducted by the experts.

{¶95} The majority also concludes that Walker's ability to knowingly and intelligently participate in the competency evaluations is "very similar" to the ability to knowingly and intelligently waive *Miranda* rights. However, the trial court did not make that finding, and the record does not support that finding.

{¶96} Dreyer stated that Walker appeared to have an "adequate understanding" of the information primarily because he had been given the same information multiple times. Moreover, Hellmann, who evaluated Walker a scant ten days after Dreyer, reported that she paraphrased the same information for Walker using simple language to maximize his understanding. Despite her efforts, he was unable to accurately summarize the information. She did not believe he understood her explanations, and ultimately, Walker did not sign the document because he did not understand it. Notably, the state presented no evidence to support a finding that the ability to participate in a competency-to-stand-trial evaluation is similar to the intellectual capacity to understand the *Miranda* rights. And neither expert testified that Walker's acknowledgement of the explanation of the court clinic rights and procedures was in any way related to his ability to understand his *Miranda* rights.

{¶97} The experts' testimony, objective testing, and comprehensive reports demonstrate that Walker's waiver was not knowing or intelligent. The limited explanation of the *Miranda* rights compounded Walker's inability to understand his rights. Both experts concluded, after objective testing, that Walker's numerous cognitive deficits prevented him from understanding the language of the *Miranda* warnings and the consequences of waiving his rights, especially his right to remain silent and his right to counsel. Dr. Dreyer testified that research has shown that the right to remain silent is the most complicated concept for intellectually-disabled individuals to understand, and this testimony was uncontroverted. Both experts also agreed that Walker was likely acquiescing to the officer's statements, and that he

lacked a full appreciation of the adversarial nature of the interrogation.

{¶98} Accordingly, I would hold that the trial court's determination that Walker's waiver was knowing and intelligent is not supported by competent, credible evidence, and therefore Walker's motion to suppress should have been granted. Based on the totality of circumstances, Walker did not have the intellectual capacity to understand the *Miranda* rights or appreciate the significance of waiving those rights. I therefore respectfully dissent.

## Conclusion

{¶99} Because Walker's waiver was not knowing or intelligent, I would sustain the first assignment of error, vacate the conviction, and remand the cause for further proceedings. I would find the remaining assignments of error to be moot.

Please note:

The court has recorded its own entry on the date of the release of this opinion.