THE STATE OF OHIO, APPELLANT, *v.* BROWN, APPELLEE.

[Cite as State *v.* Brown (1983), 5 Ohio St. 3d 133.]

(No. 82-1340—Decided June 8, 1983.)

*Mr. George E. Pattison,* prosecuting attorney, *Mr. Gregory Chapman* and *Mr. Richard Ferenc,* for appellant.

*Mr. William F. Fitzgerald* and *Mr. Robert W. Burns,* for appellee.

*Per Curiam.* The question presented is whether the court of appeals erred in overturning as against the manifest weight of the evidence the judgment of conviction entered by the trial court.

The test for insanity is set forth in *State* v. *Staten* (1969), 18 Ohio St. 2d 13 [47 O.O.2d 82], paragraph one of the syllabus, which states:

"One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law. * * *" (Citations omitted.)

The plea of not guilty by reason of insanity is an affirmative defense, *State* v. *Humphries* (1977), 51 Ohio St. 2d 95 [5 O.O.3d 89], paragraph one of the syllabus, which must be proved by a preponderance of the evidence, R.C. 2901.05(A).

Appellant bases its argument on the role of the trial court as factfinder and contends that the court of appeals usurped the factfinding function. The state cites *State* v. *Thomas* (1982), 70 Ohio St. 2d 79 [24 O.O.3d 150], for the proposition that "[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of facts." The court below distinguished *Thomas,* however, for the reason that in *Thomas* the record contained evidence "that defendant was not insane at the time of the offenses" while in the instant case "the prosecution did not offer any rebuttal witnesses to appellant's [Brown's] case." This distinction is well-taken.

For essentially similar reasons we find *United States* v. *Mota* (C.A. 5, 1979), 598 F. 2d 995, distinguishable from the case at bar. In *Mota,* the court stated at pages 999-1000 (quoting *United States* v. *Hall* [C.A. 5, 1978], 583 F. 2d 1288) that " '[i]t is not necessary for the Government to present any expert testimony to meet its burden of proof. The Government can meet its burden through the testimony of lay witnesses. A defendant is not entitled to

a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the Government attempts to rebut it without any expert witnesses. The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reasons must be objectively present for ignoring expert opinion testimony.' " In the instant case, the trial court ignored the conclusions of the expert witnesses that appellee was insane even though there was no rebuttal testimony, lay or expert, indicating that appellee was sane on February 17, 1980.[1] This was error.

In its opinion the court of appeals carefully reprised all the testimony adduced at trial, stating in pertinent part as follows:

"* * * Dr. Finnan testified that he examined the appellant [Brown] on Monday, February 19th, which was two (2) days after the shooting. During this examination, Dr. Finnan found that the appellant was in a 'catatonic type stupor' and that he was suffering from a substantial disorder of thought, mood and perception.

"* * * Dr. Finnan also revealed that his diagnosis was also based, in part, upon the results of a drug scan of the appellant which indicated a minute amount of the drug PCP in the appellant's blood stream.

"From this research, Dr. Finnan * * * concluded that within a reasonable degree of medical certainty the appellant was experiencing an 'acute schizophrenic episode' at the time of the shooting. In essence, Dr. Finnan felt that the appellant was 'definitely psychotic.' Secondly, Dr. Finnan concluded that at the time of the shooting, the appellant was unable to distinguish right from wrong, and that he was unable to control his actions. Finally, Dr. Finnan concluded that the results of the drug scan did not allow one to reach the conclusion that the appellant's mental condition was caused by drug abuse, because the amount of PCP found in the appellant's blood stream was too minute to cause such a condition.

"The next witness to testify for the appellant was Dr. Stephen Katkin, a clinical psychologist, and the Executive Director of the Clermont County Community Mental Health Center. * * * It was Dr. Katkin's opinion that the appellant, at the time of the shooting, was in an 'acute psychotic state * * * induced by the drugs that he had been using over a period of time.' In essence, he diagnosed the appellant as suffering from 'a drug induced psychotic disorder.'

"Dr. Katkin also expressed that it was his opinion, within a reasonable degree of medical certainty, that on the evening of the shooting the appellant was not able to distinguish right from wrong and that he was unable to control his own behavior.

---

[1] The state argues that because two of the expert witnesses offered different diagnoses regarding appellee's mental condition, appellee did not prove his insanity by a preponderance of the evidence. Dr. Finnan diagnosed appellee as a "schizophrenic" who showed "no evidence of a drug induced psychosis" while Dr. Katkin determined that appellee had a "drug induced psychosis." Both of these experts unreservedly concluded, however, that appellee was legally insane at the time of the shooting.

"The appellant also presented the testimony of Dr. Glenn Weaver, an Assistant Professor of Clinical Psychiatry at the University of Cincinnati and the Director of the Department of Psychiatry at Christ Hospital. Dr. Weaver testified that he first saw the appellant on February 24, 1980. After reviewing the appellant's record, and taking his history, Dr. Weaver then conducted an examination. During this examination, Dr. Weaver observed the appellant actively hallucinating (e.g., hearing vocal commands from the devil). Dr. Weaver then diagnosed the appellant's condition as 'acute schizophrenic reaction.' He further concluded that the appellant had been actively psychotic for a period of one (1) to two (2) months prior to the crime.

"During the examination of the appellant, Dr. Weaver also took into account the results of the drug scan conducted on the appellant at Cincinnati General Hospital. The result of the scan showed a residue of PCP equal to five (5) micrograms in his blood stream, which Dr. Weaver testified was well below the acute toxic level of fifty (50) micrograms. Therefore, unlike Dr. Katkin, Dr. Weaver did not opine that the appellant was in a drug induced psychotic disorder, but rather, that the appellant's major disorder was psychiatric, and that 'the drug abuse * * * was the additive to it.' Dr. Weaver also stated on direct examination that he believed the appellant 'was unable to conform his conduct to the requirements of the law.'

"The appellant then offered the testimony of three (3) lay witnesses. * * * These witnesses relayed numerous stories of bizarre behavior by the appellant for a period of several months before the shooting. There were numerous references to an abandoned church which the appellant often visited, as well as his claiming that he heard the devil's voice, and that he was going to build a rocket ship in which he planned to take his brother, father, and grandmother on a trip into space."

The record, moreover, reveals additional evidence tending to show that appellee was insane at the time his father was killed. Patrolman Davis, a prosecution witness, testified that on the night of the shooting appellee was "in like a hysterical mood at the time. * * * He was sitting on the bed kind of rocking back and forth * * * kind of mumbling and screaming." Linda Lauch, another prosecution witness, related an incident about a black cat that was "dead in the road and we [the witness and appellee] drove over it and we came back on the other side and it was on our side again and he just kept saying things about something's going to happen to somebody. We drove back over it three times, each on different sides of the road and it was on our side." Jessie Mercer, appellee's grandmother, testified that appellee had "marked off" his father and other family members from the passenger list of the rocket ship, alluded to in the court of appeals' opinion, that appellee was building to escape an impending disaster. The record recounts numerous other instances of appellee purporting to be in touch with the devil, as well as supposed contacts with guardian angels, black cats, a possessed van, and various voices. Based on this record, with its overwhelming and uncontradicted evidence of appellee's insanity, we must conclude as did the court

below that appellee "established by a preponderance of the evidence that he was insane at the time of the shooting."

For the reasons hereinbefore stated, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

CELEBREZZE, C.J., W. BROWN, SWEENEY, LOCHER, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.