OPINION
Defendant-appellant, Jenny L. Owens, appeals from her conviction following a jury trial for murder with a firearm specification. We affirm.
Appellant and the victim, Randall Slone, had lived together for twelve years. On December 20, 1996, at approximately 5:00 p.m., appellant ran into her landlady's home and stated that she had "just shot Randy." The police were called and appellant then called her employer and stated that she had shot Randy because he was about to beat her.
The police arrived and found Slone sitting in a chair with a cigarette in his hand. He had been shot in the back of the neck behind the right ear with a single action shotgun. The projectile had exited underneath the jaw. The coroner found that death was almost instantaneous. Slone's blood alcohol level was .20.
Appellant pleaded not guilty by reason of insanity. Pursuant to appellant's motion, the court appointed Dr. Jeffrey Smalldon to evaluate appellant's mental condition. The court also appointed a state agency to conduct an independent examination and evaluation of appellant's mental condition at the time of the offense. Dr. Paul Goldstein conducted this evaluation. The state did not request a third evaluation until shortly before trial.[1] The trial court denied this untimely request.
At trial, appellant testified concerning her life experiences, including abuse in previous relationships, and testified to a pattern of physical abuse by Slone. Appellant also admitted that she and Slone were heavy drinkers. On the day of the killing, she told police that she had consumed nine beers.
Appellant testified that on the day of the killing Slone had begun to verbally abuse her. Appellant then testified that she remembered entering their bedroom and looking for ammunition for one of the two single action shotguns the couple owned. Under cross-examination, appellant indicated she had formed the intent to shoot Slone or shoot herself.[2] Appellant entered the bedroom and, according to her testimony at trial and as reported to the psychologists, at some point after finding the appropriate ammunition a shadowy figure, entity or presence (slightly different descriptions appear in the psychologists' reports and appellant's testimony) actually loaded the shotgun, went down the hall (with appellant either beside or following), and shot Slone. Appellant was rigorously cross-examined on alleged inconsistencies in her account with statements she had provided to the two psychologists. She was also cross-examined concerning inconsistencies with the physical evidence.
Dr. Paul Goldstein, the court-appointed psychologist, testified that he had spoken with appellant on three separate occasions. Dr. Goldstein reported that he had discussed her background, her relationship with the victim, and the shooting. He stated that in his opinion her accounts of her life and the shooting seemed "consistent and believable." He testified that appellant had described dissociative experiences. For instance, he found it significant that she could detach from her experiences while being beaten. Dr. Goldstein stated that on the day of the killing appellant related that Slone had been verbally abusive and she "wanted him to stop." Appellant told Dr. Goldstein "she was thinking that she might kill herself, she might kill him, but she just had to have the bullets." She stated that she did not find a shell in the closet but then noticed a shell on the floor and picked it up. At that point, she "began to sense the presence of something else in the room." She described it as a human-like figure; she stated that she saw this entity loading the shell into the shotgun. Appellant related that the ensuing events transpired as she was watching passively. She observed the "entity" point a gun at the back of the chair; she thought the chair was occupied by a mannequin. Appellant's next recollection was she had come back more into her "normal kind of consciousness" and she realized that the mannequin was Slone. She noticed red on his clothing which she first thought were strawberries they had eaten earlier in the day. She also noticed a cigarette burning in Slone's fingers which she took out of his hand. She then ran to her neighbor's house.
Dr. Goldstein testified that he did not believe appellant was fabricating her story. He stated that he administered the commonly used personality test, MMPI-2. He diagnosed appellant as having a dissociative disorder, the description of the out-of-body experience and the act of shooting by another entity was, he testified, consistent with that diagnosis. He also testified that appellant was a victim of battered woman's syndrome, although he stressed that the diagnosis of dissociative disorder and battered woman's syndrome were two separate findings. Dr. Goldstein stated, based upon a reasonable degree of probability, that as a result of the severe mental illness she was suffering, appellant did not under stand what she was doing, was not in control of what she was doing, and at no point formulated a plan to shoot Slone. He also opined that as a result of a serious mental illness appellant did not understand the wrongfulness of what she was doing.
Under cross-examination, Dr. Goldstein acknowledged that he had no specialized training on dissociative disorder or battered woman's syndrome. He also acknowledged that he had not contacted any of appellant's family members or any other witnesses. Dr. Goldstein was also cross-examined extensively concerning the F-scale on the computer program score of appellant's MMPI-2 testing. Appellant's F-scale was significantly elevated, suggesting a possibility of "distortion or exaggeration of the severity of psycho pathology in an attempt to derive secondary gain." The clinical profile generated by the computer program also indicated a code type of "individuals seen as angry and hostile who deny their readily apparent hostile and angry feelings." The prosecutor pointed out that Dr. Goldstein had not discussed these items in his report. Dr. Goldstein explained that he had not relied extensively on the MMPI-2 in preparing his report and had relied more on his inter view, as in his clinical judgment, there could be many reasons for a high F-scale.
The prosecution also read Dr. Goldstein some portions of appellant's testimony in an attempt to highlight inconsistencies between her account on the stand on various matters (i.e., childhood memories, an alleged rape at age twelve or thirteen, usage of LSD, whether she and Slone discussed the first beating he inflicted on her the next morning) and her account to him or to Dr. Smalldon. Dr. Goldstein acknowledged some inconsistencies.
Dr. Smalldon, the expert requested by the defense, testified that he interviewed appellant for approximately four hours (neither psychologist saw the other's report prior to its filing with the court). Dr. Smalldon reviewed grand jury testimony and witness statements. He also administered the MMPI-2 and two other assessment procedures. Dr. Smalldon reported that he always began his criminal psychological evaluations "with a certain amount of suspicion recognizing it is going to be very important to evaluate the credibility of the defendant." He found that appellant was credible, partly because she was reluctant to disclose a lot of details, a symptom consistent with the behavior of battered women. Dr. Smalldon testified that he had diagnosed appellant as suffering from post-traumatic stress disorder with dissociative symptoms. He testified that at the time of the shooting appellant was suffering from a severe mental illness and was not able to know or appreciate the wrongfulness of her actions. Dr. Smalldon was cross-examined extensively concerning inconsistencies in appellant's account of both her previous relationship with Slone and the shooting itself. He testified that he would not expect complete consistency in such accounts.
Appellant also presented testimony concerning battered woman's syndrome and testimony from her co-workers at a family nursing home. One of these co-workers testified that she had seen a bruise on appellant's arm and that appellant was very nervous about keeping Slone waiting when he came to pick her up. A teenage former neighbor testified that he had seen Slone hit appellant in the face during the summer of 1995. Appellant's sister testified concerning bruising she had observed on appellant and appellant's son testified to abuse he had witnessed.
The prosecution presented nine rebuttal witnesses, largely family and friends of Slone. Many of these witnesses had also known appellant and at least four expressed opinions that appellant was not truthful. Several witnesses testified that appellant was verbally abusive towards Slone and one stated that appellant had admitted to hitting Slone while he was asleep. Another rebuttal witness testified that in the early 1990s he had heard appellant threaten Slone, "do not sleep, I will cut you." Many witnesses testified that Slone was not violent or belligerent when intoxicated. The prosecution also established that no domestic violence incidents had been reported concerning Slone and appellant. Slone's former wife testified that he was not abusive in that relationship and further testified that appellant had become verbally abusive when intoxicated on one occasion at her home.
Appellant moved for acquittal pursuant to Crim.R. 29 at the close of the state's case. The trial court overruled this motion. Appellant moved for acquittal again after the defense rested and her motion was again overruled. The jury found appellant guilty and she renewed her Crim.R. 29 motion. Appellant argued that because both experts' opinions had supported her insanity defense, the jury had not properly weighed the evidence. In a detailed entry, the trial court overruled appellant's motion, finding that the jury could consider the psychological testing results along with inconsistencies in the evidence in weighing the experts' opinions. Appellant has raised three assignments of error:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR ACQUITTAL UNDER RULE 29, CRIM. RULES.
Assignment of Error No. 2:
 THE COURT ERRED IN NOT DIRECTING THE JURY TO DISREGARD ANY INFERENCE DRAWN FROM THE PROSECUTOR'S QUESTIONS CONCERNING BOOKS IN THE POSSESSION OF DEFENDANT AND THE DEFENDANT'S QUALIFICATION AS AN "EMT."
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY AS TO THE EFFECT OF A FINDING OF NOT GUILTY BY REASON OF INSANITY.
In her first assignment of error, appellant argues that be cause both experts testified that she suffered from a severe mental illness and was not able to understand the wrongfulness of her actions, the trial court erred in overruling her Crim.R. 29 motions for acquittal. Appellant argues that the experts established her defense by a preponderance of the evidence and there was therefore insufficient evidence to support her conviction.
The defense of insanity is an affirmative defense. The burden of going forward with the evidence of this affirmative defense, and the burden of proof by a preponderance of the evidence, is upon the accused. R.C. 2901.05(A). A person is "not guilty by reason of insanity" only if [she] proves "that at the time of the commission of the offense, [she] did not know, as a result of a severe mental disease or defect, the wrongfulness of [her] acts." R.C. 2901.01 (A)(14). If the record demonstrates that the trier of fact has considered the insanity defense, the reviewing court should defer to the trier of fact's interpretation of the evidence. State v. Curry (1989), 45 Ohio St.3d 109, 114. "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of fact."State v. Thomas (1982), 70 Ohio St.2d 79, 80. A trial court's judgment as to insanity will only be reversed where overwhelming and uncontradicted evidence leads to a contrary conclusion. Statev. Brown (1983), 5 Ohio St.3d 133.
Appellant argues that because the experts' testimony was not rebutted by other expert testimony on the insanity issue she met her burden of proving insanity by the preponderance of the evidence. A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. State v. Thompkins (1997),78 Ohio St.3d 380, 390 (Cook, J., concurring). On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. Accordingly, the state's reciprocal burden of production in this case was to present evidence from which a jury could determine that appellant had not established insanity. Thus, if the state presented evidence which, if believed, could lead the jury to find that appellant had not proven her insanity defense by a preponderance of the evidence, appellant's conviction must stand. On this review, unlike a challenge to the manifest weight of the evidence, the appellate court must view the evidence in the light most favorable to the prosecution. Thompkins; State v. Jenks
(1991), 61 Ohio St.3d 259, 273.
Appellant's evidence on the insanity issue consisted of the testimony of the two experts, as well as her account of the allegedly dissociative episode. The state's rebuttal evidence consisted of admissions by the experts during cross-examination, challenges to appellant's credibility on cross-examination, and inconsistencies in appellant's accounts to the experts and at trial. The prosecution also highlighted inconsistencies in appellant's account and the physical evidence.[3] Finally, the prosecution presented rebuttal testimony by witnesses who expressed opinions that appellant was not truthful. Both experts acknowledged during cross-examination that appellant's credibility was crucial to their determinations. Her accounts of her past and, importantly, of Slone's alleged abuse were deemed credible by both, although they had minimal corroboration from independent sources. The state's cross-examination of these witnesses therefore effected the weight of their evidence.
We find that the Ohio Supreme Court's analysis in State v.Brown (1983), 5 Ohio St.3d 133, is dispositive. In Brown, the conviction was against the manifest weight of the evidence because the evidence of insanity had gone completely unrebutted. Some rebuttal was deemed necessary, though the threshold was not high. The court quoted the reasoning of the Fifth Circuit Court of Appeals in United States v. Mota (C.A.5, 1979), 598 F.2d 995,999-1000. That court had noted that cross-examination of an expert alone may be sufficient to create a jury issue on insanity and that:
 [i]t is not necessary for the Government to present any expert testimony to meet its burden of proof. The government can meet its burden through the testimony of lay witnesses. A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the Government attempts to rebut it without any expert witness. The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reasons must be objectively present for ignoring expert testimony.
The expert testimony presented in this case was not arbitrarily ignored or unrebutted. It was subject to rigorous cross-examination which revealed that the experts' opinions rose or fell largely on appellant's credibility. The jury was also presented with rebuttal evidence impugning appellant's credibility and was in the best position to weigh that evidence. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus (weight to be given evidence and the credibility of witnesses are primarily for trier of fact). The evidence of appellant's insanity, although admittedly substantial, was not "overwhelming and uncontradicted." See Brown,5 Ohio St.3d at 136. Therefore, the evidence against appellant was sufficient to support her conviction, and appellant's first assignment of error is overruled.
In her second assignment of error, appellant argues that the prosecutor improperly questioned witnesses concerning certain books (novels by Stephen King and others) found in appellant's home and also questioned some witnesses on whether they knew that appellant was an "emergency medical technician." Appellant argues that the jury was "left to speculate whether Defendant was in fact an `EMT' and whether her version had a basis in a novel." The record reflects, however, that the court did in fact instruct the jury as follows:
 Ladies and Gentlemen of the jury, the prosecution during the course of the case has questioned a witness or certain witnesses concerning a fact that the defendant was an EMT emergency medical technician. There's no evidence that Jenny Owens is an EMT, therefore, you are instructed to make no inferences from that question.
This instruction clearly would have cured any error in the state's questioning concerning appellant's medical training.
The questioning concerning novels found in appellant's home appears to have been quite limited. Although such books had no real relevance and questioning concerning them was arguably improper, we do not find that a specific limiting instruction was necessary. The trial court instructed the state that it would be inappropriate to argue any inference from the possession of the books to the jury in their closing. We have carefully reviewed the prosecution's closing argument and find that this instruction was scrupulously followed. For instance, in its initial summation, the state did not argue that appellant had fabricated her story of the presence of a thing or an entity at the time of the shooting. Rather, the state argued in general that the jury should "focus on the credibility of the defendant [and] the objectivity of the experts." In rebuttal, the state pointed to the witnesses who contradicted appellant's portrayal of the victim as an abuser, the MMPI evidence indicating appellant fit a profile of those who "avoid acknowledging any kind of personal responsibility for their problems," and numerous alleged inconsistencies in her accounts to the examining psychologists and her account on the stand. The state also argued that it was up to the jury to determine if appellant's story was fabricated.
Although there was no limiting instruction concerning the references to books, under the circumstances of this week-long trial, the brief inappropriate reference to books in the prosecution's case did not warrant such a limiting instruction as a matter of law, and the failure to so instruct is, at worst, harmless error. See Civ.R. 52. Accordingly, appellant's second assignment of error is overruled.
In her third assignment of error, appellant argues that the court erred in not instructing the jury as to the effect of a finding of not guilty by reason of insanity. Appellant candidly admits that her only authority for this proposition comes from a dissenting opinion and from other jurisdictions. Although the jury may have been left with "the idea that its a bad idea to find insanity," the trial court did not err by failing to instruct the jury on the disposition of a defendant found not guilty by reason of insanity. Ohio law provides that a hearing will be held following such a verdict and the acquitted defendant may well be institutionalized pursuant to that hearing. See R.C. 2945.50. However, there is no requirement that the jury be instructed on the effect of a finding of not guilty by reason of insanity.State v. Siddle (1971), 28 Ohio St.2d 135, syllabus (relying on R.C. 2945.11 which provides that the court must instruct the jury that in determining the question of guilt, it must not consider the punishment as punishment rests with the court). The trial court properly instructed the jury on the issues surrounding appellant's not guilty by reason of insanity plea and on the respective roles of the jury and the court. Appellant's third assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and VALEN, J., concur.
[1] Pursuant to R.C. 2945.39(A), up to three evaluations of a defendant's mental condition at the time of the commission of the offense may be ordered.
[2] Some of appellant's testimony on this issue was as follows:
 Q: So you are going through this closet, you are pulling things out, you are looking for bullets for a gun, right?
A: Yes.
Q: So you can shoot either yourself or Randy * * *?
A: Yes.
* * *
 Q: * * * Your thought process is I'm looking for bullets in the closet so I can murder Randall Slone.
Is that what you were thinking?
A: No, I wasn't thinking of murder.
Q: You were thinking of killing him, weren't you?
A: Yes.
[3] For instance, appellant testified that she threw things around in the closet while searching for a bullet; however, the closet was not in disarray. Additionally, appellant's report that she removed the cigarette from Slone's hand was belied by the evidence.