[Cite as *Calandra v. Rowbotham*, 2025-Ohio-5826.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Nicoline M. Calandra

      Appellant

v.

Terry R. Rowbotham, et al.,

      Appellees

Court of Appeals No. OT-25-001

Trial Court No. 22CV132

**DECISION AND JUDGMENT**

Decided: December 30, 2025

* * * * *

J. Mark Trimble and
Stephen E. House, for appellee.

John K. Fitch, and
Kirstin A. Peterson, for appellant.

* * * * *

**ZMUDA, J.**

## I.    Introduction

**{¶ 1}** This matter is an appeal of the trial court's denial of a motion for judgment notwithstanding the verdict and motion for new trial, filed by appellant/plaintiff Nicoline M. Calandra, following a jury trial in her medical negligence suit. Based on the following, we affirm the trial court's judgment.

## II. Background and Procedural History

{¶ 2} Calandra sustained injuries in a motor vehicle accident in Ottawa County, caused by appellee/defendant Terry Rowbotham. Calandra sought medical treatment for a closed head injury and concussion, which included CT and MRI scans, neurocognitive testing, and treatment for dizziness, headache, nausea, and blurred vision. Calandra filed suit alleging negligence, and the matter proceeded to a jury trial on April 16, 2024. Rowbotham acknowledged negligence but disputed the extent of Calandra's claimed injuries and damages. Because Rowbotham suffers from dementia, he did not attend the trial.

{¶ 3} The issue at trial concerned the extent to which Calandra's medical bills relate to the injury sustained in the accident. Prior to the accident, Calandra had two TMJ surgeries, in 2018 and 2020, with the TMJ associated with job stress. Calandra also had a history of migraines, arthritis of the neck, and she had cataracts and wore corrective lenses. Three months before the accident, Calandra also complained of ear pain and right-side headaches, and reported discomfort when chewing, related to her TMJ issues. An MRI of the brain, taken after the accident, revealed existing small vessel ischemia disease, an age-related condition that is linked with memory loss.

{¶ 4} After the accident, the emergency room doctors diagnosed Calandra with a closed-head injury without loss of consciousness. Calandra followed up with her primary care physician, Dr. Bonnie Case, in the following weeks and was diagnosed with concussion without loss of consciousness. Calandra reported symptoms including dizziness, nausea, neck pain, blurred and double vision, light sensitivity, anxiety,

2.

depression, mental fogginess, hearing difficulties, and memory issues. Her treatment after the initial assessment in the hospital emergency room included follow-ups with her primary care physicians, Dr. Case and Dr. Jeffrey Garman, and treatment at the Cleveland Clinic Neurologic Institute and the University of Pennsylvania Medical Center (UPMC) concussion clinic. Calandra also received physical therapy and vestibular/ocular therapy. After four months, Calandra's treating doctors noted normal physical exams, and by mid- to late-2021, doctors noted Calandra's physical concussion symptoms were either improved to near normal or resolved, based on treatment notes and Calandra's own report of her symptoms, as reflected in her medical records. The lingering cognitive deficits Calandra reported were deemed not inconsistent with the effects of aging throughout the medical records. However, Calandra's primary care physicians continued to treat her for concussion, and she reported continuing or relapsing symptoms, triggered by exertion or stress.

{¶ 5} While the issue at trial was the extent of Calandra's injuries and damages, the issue on appeal concerns whether Rowbotham needed to present his own expert medical testimony to rebut Calandra's expert testimony. At trial, Calandra presented two medical experts, Dr. Jonathan Pedrick, a physician and brain injury specialist, and Dr. Steven Curtis, an optometrist with specialized training in neuro-optometric rehabilitation. Calandra's medical records were also admitted, without objection.[1] Rowbotham rested his

---

[1] Calandra did object to Rowbotham's exhibits for Dr. Goth's care, based on Dr. Goth's difficult-to-read handwriting, but she otherwise acknowledged the exhibits had been referenced in testimony. The trial court admitted these records.

3.

case without presenting witness testimony, relying on cross-examination of Calandra's witnesses and the defense exhibits introduced through that testimony.

{¶ 6} One of the records emphasized by Rowbotham's counsel at trial concerned the opinion of Dr. Nicholas DenBesten. In April 2021, Calandra's primary care physician, Dr. Garman, referred her to Dr. DenBesten, a neuropsychologist, for "evaluation to assist with facilitating and informing medical differential diagnosis and clinical decision-making." Calandra was evaluated by Dr. DenBesten, and in his report, DenBesten provided the following opinion as to Calandra's continuing symptoms:

> Current neuropsychological evaluation is largely characterized by reduced attention and processing speed. Memory performance was variable and, when attentive, is expected to be consistent with pre-morbid estimates. A single, uncomplicated concussed event, such as above, is expected to spontaneously resolve within days to weeks of injury. Persisting symptoms beyond that timeframe are typically perpetuated by persisting physical discomfort and/or emotional distress. Her cognitive concerns are in the context of mild depression, moderate anxiety, and persisting physical discomfort such as headache, dizziness, nausea, and blurred vision. She has become quite fixated on these issues and the extreme physical discomfort she is experiencing. As a result, the combination of these factors appears to be sapping her attentional resources, thereby interfering with optimal memory in cognitive efficiency. She may be experiencing posttraumatic headache and persisting cervical vertigo v. labyrinthine concussion; however, current presentation is not consistent with cerebral concussion. Patient is not demonstrating any compelling evidence of persisting cognitive sequela associated with the abovementioned injury.

{¶ 7} Following this evaluation, Calandra completed treatment at the concussion clinic at UPMC, with the UPMC doctors determining Calandra had recovered from her concussion. With Calandra's physical exams showing recovery from the concussion, the focus shifted to Calandra managing her stress and anxiety. Calandra returned to her

4.

primary care physician and continued to receive treatment for recurring concussion symptoms. She was still receiving treatment at the time of trial.

{¶ 8}  At trial, Calandra argued that her ongoing symptoms were all related to the accident. Rowbotham argued that within months of the accident, Calandra's accident-related injuries had all been resolved, and the remaining symptoms either resulted from preexisting conditions or were age-related. Calandra was 71 years old at the time of trial.

{¶ 9}  In addressing Calandra's argument on appeal, a summary of the trial testimony is necessary.[2]

{¶ 10} First, Dr. Jonathan Pedrick testified regarding his review of Calandra's medical records and his own evaluation of Calandra in his capacity as a brain injury specialist. Dr. Pedrick noted that Calandra's physical examination was normal, showing normal physical abilities like walking and strength and flexibility. Dr. Pedrick testified that Calandra suffered from post-concussion syndrome, noting all her reported symptoms were consistent with the lingering effects of her head injury.

{¶ 11} Dr. Pedrick indicated that most people recover from concussion within about three months, but for a rare group, about 10%, the effects of concussion linger for a year or years. Based on his review of the medical records and his own examination, he believed Calandra fell into this rare group. Dr. Pedrick determined that Calandra's report of changes to her senses of smell and taste was particularly significant, and more likely

---

[2] The testimony is presented out of order. At trial, the testimony of Calandra and her husband was presented after the video deposition of Dr. Pedrick, and before the video deposition of Dr. Curtis, which was played for the jury the next day.

5.

than not indicative of a lingering concussion. Dr. Pedrick also described the recovery process as "up and down," with bad days often coinciding with stressors. He testified that, while most of Calandra's symptoms were resolved, a small subset of symptoms remained, negatively impacting Calandra's quality of life.

{¶ 12} On cross-examination, Dr. Pedrick acknowledged that he previously reviewed 14 cases for Calandra's counsel over the past seven years, receiving compensation for his work, and he did not treat Calandra but only provided an expert opinion after seeing her. He also acknowledged that Calandra's reported loss of taste and smell appeared nowhere in her medical charts as a prior complaint, and Dr. Pedrick's own examination of Calandra showed normal physical results. When questioned about specific neurological complaints, Dr. Pedrick agreed that Calandra's complaints could relate to migraine, and Dr. Pedrick agreed that Calandra's concussion symptoms did not manifest until the days following the accident, indicating minor concussion.

{¶ 13} Rowbotham's counsel also questioned Dr. Pedrick about Dr. DenBesten's findings. Dr. Pedrick acknowledged that Calandra presented as overly concerned with her physical ailments. Dr. Pedrick also acknowledged that a subsequent examination with Dr. Puskar, a neuropsychologist from UPMC, echoed the need for Calandra to better regulate stress and anxiety based on Calandra's extreme reaction to minor stressors. Dr. Pedrick disagreed with Dr. DenBesten's conclusion that Calandra's continuing symptoms were inconsistent with concussion, opining that Calandra's loss of taste and smell and lingering headaches indicated post-concussion syndrome. At the same time, Dr. Pedrick agreed with the findings of Dr. DenBesten and Dr. Puskar that managing stress was important in

6.

managing Calandra's symptoms, going forward. Overall, Dr. Pedrick disagreed with subsequent doctors who determined Calandra's concussion symptoms had resolved, based on his own conclusion that Calandra was part of the 10% that experienced lingering symptoms that could be addressed with additional treatment.

{¶ 14} Calandra's second medical expert was Dr. Steven Curtis, an optometrist with specialized training in neuro-optometric rehabilitation, the treatment of patients with neurological injury to the vision system. Dr. Curtis examined Calandra in September 2023, performing a structural examination of the eye and conducting functional tests of Calandra's vision. Dr. Curtis noted five deficits in Calandra's vision that he concluded were accident related: convergence insufficiency, saccadic eye movement deficiency, smooth pursuit eye movement deficiency, dizziness, and a contraction of peripheral vision. He clarified that his diagnosis was limited to deficits related to concussion, based on the prior diagnosis of concussion by medical doctors. Dr. Curtis recommended treatment to address these deficits, testifying to the length and cost of that treatment.

{¶ 15} On cross-examination, Dr. Curtis acknowledged that some of Calandra's symptoms might also be caused by migraines or cataracts or age, and previous exams noted none of the vision deficits he observed. Dr. Curtis also noted that Calandra received vision therapy prior to seeing him, as part of vestibular/ocular therapy. Rowbotham's counsel then went through the various medical records, pointing out inconsistencies in Calandra's report of symptoms by comparing her prior reports to doctors or therapists to the history Calandra provided to Dr. Curtis, as well as prior conclusions that Calandra's concussion symptoms had resolved. Dr. Curtis agreed that Calandra's report to him did

7.

not match the medical records. He disagreed, however, with conclusions regarding concussion symptoms as resolved as it related to Calandra's vision. As to future treatment, Dr. Curtis acknowledged that Calandra did not return to his office for treatment, and there were no medical records noting the neuro-optometric treatment he recommended, after her exam with Dr. Curtis.

{¶ 16} Calandra presented her own testimony to support her claim for damages. Pertinent to this appeal, she described her prior work as a design professional, requiring precise mathematical computations and measurements to attain proper fit for the apparel she designed, indicating her work also involved supervising others throughout her career. She acknowledged that, at the time of the accident, she was not working, as she was on disability for her TMJ surgeries and treatment for complications of the surgery that included damage to her ear canal. Calandra testified, however, that at the time of the accident, her TMJ-related issues were resolved and she was pain free.

{¶ 17} Calandra further testified regarding her prior medical history, indicating she took several prescriptions for allergic reactions, as needed, and she was allergic to many things and suffered anaphylactic shock with exposure. She also testified that she was having trouble seeing print on the computer and focusing on her designs, but her eye doctor adjusted her contact prescription, and she was happy with the results. Calandra also admitted she was previously diagnosed with anxiety and depression, but testified that the anxiety arose from her TMJ issues, and she never agreed with the depression diagnosis. She denied she suffered from depression just before the accident or had previous arthritic pain in her neck, stating, "Couple months before the accident, I was

8.

really feeling good. It was like, you know, after all of the TMJ stuff, it was remarkable that I was feeling good again."

{¶ 18} Immediately after the accident, Calandra testified she felt headache and jaw pain, with her prior TMJ issues exacerbated. Days later, she experienced an increase in that pain, and experienced nausea, dizziness, blurry vision, and pain radiating down her neck to her arm. Calandra also reported that lying in bed was difficult. Doctors diagnosed concussion, and Calandra received treatment at the UPMC concussion clinic. As to Dr. DenBesten, Calandra remembered the exam and that Dr. DenBesten did not believe she suffered from concussion. Calandra testified, "He was very clear when he said to both me and my husband that I could not be complaining of a concussion because – or a brain injury because you have to be in a coma for a period of time in order to have a brain injury." Calandra indicated her primary care doctor, who had referred her to Dr. DenBesten, did not agree with Dr. DenBesten's conclusion.

{¶ 19} Calandra testified that she continued receiving treatment for concussion after seeing Dr. DenBensten. She received mindful therapy at UPMC and worked on her vision and reading through color therapy and reading therapy sessions. Calandra testified that she was released to drive around mid-2022, and in June 2023, Dr. Collins at UPMC concluded Calandra's concussion symptoms were resolved. In late 2023, however, Calandra returned to her primary doctor, complaining of renewed symptoms after attending family functions in Chicago in September through October of that year. While her physical exams were normal, she reported flare-ups of her concussion symptoms, triggered by sounds and lights, with similar experiences after activities like shopping or

eating in restaurants or other outings with bright or noisy environments. Calandra emphasized that she continues to receive treatment for her concussion symptoms.

{¶ 20} On cross-examination, Calandra acknowledged that she does attend gatherings, eat at restaurants, socialize, take care of her home, cook, and tend her plants. She also admitted that she did not hit her head in the accident and had initially reported no loss of consciousness to the paramedics, following the accident. Calandra also acknowledged that all scans of her brain, following the accident, showed no signs of concussion; her neurological exams were all normal.

{¶ 21} When questioned on her exam with Dr. DenBesten, Calandra disagreed with the findings. Dr. DenBesten noted Calandra's peripheral vision was good, her memory of facts and dates was excellent, and Calandra had recall of the events during the accident. Calandra also admitted that Dr. DenBensten did not reference "coma" in his report, and while she admitted he told her she did not have a concussion, she maintained that he based this solely on the lack of a coma. Calandra also insisted that Dr. DenBesten was the only doctor that told her that her symptoms were not consistent with a cerebral concussion, deeming the symptoms stress-related, but also agreed that at a November 2022 appointment she reported she was not experiencing concussion symptoms.

{¶ 22} Calandra otherwise denied that subsequent doctors determined her concussion symptoms were resolved, or attributable to stress or age-related conditions, insisting the records were incorrect. Calandra also acknowledged she was pursuing a wrongful termination suit between April 2020 and May 2021, around the time of the August 2020 accident and initial treatment. As part of her claims against her prior

10.

employer, she alleged harassment and increased stress in her life arising from her employment, and Calandra admitted that stress is a major contributor to her symptoms.

{¶ 23} Finally, Calandra presented the testimony of her husband, John. His testimony was based on his perception of Calandra, both before the accident and after. John testified regarding Calandra's talent for her career and her activities, pre-accident, indicating that she was unable to function the same way after the accident. John indicated Calandra spent more time lying in bed with headaches, and while she slowly improved through therapy, the treatments had to constantly change as her progress "flattened out." John testified that he could gauge Calandra's headaches by the degree her eyes crossed, and the couple could not plan vacations as Calandra continues to experience debilitating headaches. John testified regarding the many appointments and the couple's out-of-pocket expenses for treatments, including mileage, tolls, and hotel stays.

{¶ 24} On cross-examination, John acknowledged that Calandra's claimed difficulty in lying in bed was inconsistent with his observation that she would lie in bed for hours or days at a time. John was not present for Dr. DenBesten's testing of Calandra and knew little about the tests performed by other practitioners. John believed the medical record, showing Calandra reported no concussion symptoms in November 2022, was inaccurate.

{¶ 25} At the end of John's testimony, Calandra rested her case. Rowbotham presented no witnesses, and the matter proceeded with jury instruction and closing argument.

11.

{¶ 26} In closing arguments, Calandra's trial counsel acknowledged that Calandra's MRI and CT scans were normal following the accident, but doctors still determined there was brain injury. Calandra's counsel also acknowledged that the concussion clinic determined Calandra's concussion systems had resolved around June 2023, but Calandra's doctors continued to treat her for her symptoms as her brain injury was only partially recovered, and she suffered relapses. Based on the need for continuing treatment and therapy and the pain and suffering incurred, counsel argued that economic and noneconomic damages totaling $500,000 were appropriate.

{¶ 27} Rowbotham's trial counsel disagreed, but acknowledged Calandra had suffered a concussion because of the accident. Rowbotham's counsel argued that the medical record demonstrated mild concussion, and that Calandra suffered migraines, memory issues, and additional age-related ailments prior to the accident, with these ailments reported post-accident as lingering complaints arising from her concussion. Rowbotham's counsel emphasized Dr. DenBesten's finding in April 2021, that Calandra "has a somatic preoccupation with self-reporting. Tendency to physically expressing emotional distress." He noted that another doctor reached the same conclusion two months later and the concussion clinic subsequently discharged Calandra, finding full recovery from concussion. Counsel referenced Calandra's medical record, noting her preexisting conditions and the many stressors in her life during the period after the accident, arguing Calandra reported her emotional distress as concussion symptoms. Based on the conclusions of Dr. DenBensten and others, Rowbotham's trial counsel argued that appropriate damages consisted of the amount spent on medical care up until

12.

Dr. DenBesten's consultation, or $15,206.24, with an equal amount for Calandra's pain and suffering.

{¶ 28} Following deliberation, the jury returned a verdict for Calandra and awarded her $15,206.24 for past economic loss and $15,000.00 for past noneconomic loss, with no award for future loss, for a total award of $30,206.24. Calandra moved for judgment notwithstanding the verdict pursuant to Civ.R. 50(B), and a motion for new trial pursuant to Civ.R. 59(A)(6). Calandra argued that the jury limited the award based on argument of Rowbotham's counsel, incorrectly stating that Calandra did not suffer from concussion, and that the weight of the evidence supported an award of damages beyond the date of Dr. DenBesten's consultation.

{¶ 29} Rowbotham opposed the motion, arguing that the record supported the jury's award of damages. Rowbotham noted that the jury had additional evidence beyond Dr. DenBesten's report, showing subsequent medical providers had also documented Calandra's normal neurologic findings and recovery from concussion, with ongoing complaints unrelated to the accident and concussion. Of note, Rowbotham cited to specific parts of Calandra's medical record, entered as exhibits at trial and considered by the jury in its deliberations:

(1) June 10, 2021 correspondence from Dr. Puskar, Psy.D., UPMC concussion clinic, to Dr. Case, noting Calandra's "current symptoms indicate a need for better regulation of stress and anxiety;" a
(2) November 22, 2022 progress note from Dr. Burley, PhD., UPMC concussion clinic, recording Calandra's denial of "all physical symptoms of concussion;"
(3) December 6, 2022 progress note from Dr. Vincent, D.O., Cleveland Clinic Neurologic Institute, documenting a normal neurological examination;

13.

(4) June 6, 2023 progress note from Dr. Collins, PhD., UPMC concussion clinic, finding "current presentation is notable for anxiety…and not due to any concussion etiology;"

(5) August 31, 2023 note from Dr. Collins, finding Calandra "has remained asymptomatic at rest and with physical activity, I believe she has fully recovered from the concussion;" and

(6) October 17, 2023 note from Dr. Collins, finding "symptoms from the cerebral concussion have resolved."

{¶ 30} In reply, Calandra argued that Rowbotham's opposition argument relied on selections from the medical record, "cherry-picked" to misrepresent the concussion treatment that Calandra continued to receive and still receives to treat her accident-related injuries.

{¶ 31} The trial court denied the motion for judgment notwithstanding the verdict and motion for new trial, finding the verdict supported by competent, credible evidence going to all essential elements, and not against the manifest weight of the evidence.

{¶ 32} This appeal followed.

### III. Assignments of Error

{¶ 33} Calandra raises the following assignments of error on appeal:

1. The Trial Court erred to the prejudice of Appellant Nicoline M. Calandra in its decision to deny her Motion for Judgment Notwithstanding the Verdict and Motion for New Trial.

2. The jury's decision to limit Appellant Nicoline M. Calandra's recovery to medical expenses only up to April 21, 2021 was against the manifest weight of the evidence.

### IV. Analysis

{¶ 34} Calandra's assignments of error challenge the amount of the jury award, arguing the "decision to cut off recovery for medical expenses as of April 21, 2021 – for a

14.

total of $15,206.24 – was not supported by any evidence whatsoever, let alone any legally sufficient evidence or the manifest weight of evidence." Calandra argues that the "uncontroverted testimony" of her experts demonstrated the connection between her subjective complaints of injury and the accident, and the jury verdict was inconsistent with this credible testimony.

{¶ 35} In her first assignment of error, Calandra challenges the sufficiency of the evidence and denial of her Civ.R. 50(B) motion. In her second assignment of error, she challenges the weight of the evidence and denial of her Civ.R. 50(B) and 59(A)(6) motions. For ease of discussion, we address her assignments of error together.

{¶ 36} Calandra's post-verdict motions were pursuant to Civ.R. 50(B) and Civ.R. 59(A)(6), which provide in pertinent part:

> (B) Post-Trial Motion for Judgment or for Judgment Notwithstanding the Verdict or in Lieu of Verdict.
>
> (1) Whether or not a motion to direct a verdict has been made or overruled, a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion… A motion for a new trial may be joined with either motion, or a new trial may be requested in the alternative.
>
> …
>
> (3) If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. …

Civ.R. 50(B).

15.

(A)     Grounds for New Trial. A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
…
(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

Civ.R. 59(A)(6).

{¶ 37} We review a decision on a motion for judgment notwithstanding the verdict, under Civ.R. 50(B), de novo, based on the manifest weight of the evidence standard. *Dayton v. CSX Transp., Inc.,* 2013-Ohio-3845, ¶ 27 (6th Dist.). The motion presents only questions of law, and not factual issues. *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 25, citing *Posin v. A.B.C. Motor Court Hotel, Inc.,* 45 Ohio St.2d 271, 275 (1976). In considering a motion for judgment notwithstanding the verdict, we construe the evidence most strongly for the nonmoving party, and "where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [the motion]." (Citation omitted) *Posin* at 275.

{¶ 38} We review a decision on a motion for new trial, under Civ.R. 59(A)(6) for an abuse of discretion. *Osler v. City of Lorain,* 28 Ohio St.3d 345, 351 (1986). "[I]n ruling on a motion for a new trial, the trial court is afforded wide discretion in determining whether a jury's verdict is against the manifest weight of the evidence, for the court must ensure, in its supervisory capacity, against a miscarriage of justice." (Citations omitted), *Osler* at 351. An abuse of discretion means the trial court's attitude in

16.

denying the motion was arbitrary, unreasonable, or unconscionable. *Hess v. United Ins. Co. of Am.,* 74 Ohio App.3d 667, 679 (6th Dist.1991), citing *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

{¶ 39} Here, Calandra's argument focuses on the expert testimony, demonstrating medical expenses beyond the date of her consultation with Dr. DenBesten. Calandra argues that the issue of treatment and the causal connection to the accident required expert testimony and Rowbotham presented no witnesses to establish the lack of causation for all her medical expenses. However, Calandra fails to address the entire record, which includes cross-examination of Calandra's experts and Calandra's medical records. These records include Dr. DenBesten's conclusions, as well as subsequent medical findings by other treatment providers that Calandra's concussion symptoms had resolved.

{¶ 40} As noted by Rowbotham, a jury considered all the evidence in reaching the verdict and awarding damages, and "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, (1967), paragraph one of the syllabus. "This rule is applied even when the witness is an expert witness whose testimony is not countered by testimony from a second expert witness." *Wamer v. Pfaff,* 1998 WL 161195, *2 (6th Dist. Mar. 31, 1998), citing *State v. Brown,* 5 Ohio St.3d 133, 134-135 (1983) (additional citations omitted.).

{¶ 41} Calandra's position, that the evidence points to only one conclusion, is belied by the record in this case. The expert testimony in her favor was challenged through vigorous cross-examination, based on Calandra's medical records. Through

17.

cross-examination, Dr. Pedrick and Dr. Curtis both acknowledged that they relied on Calandra's report to them regarding her symptoms, and that their respective opinions were based, in part, on inaccurate or incomplete information as a result. Dr. Pedrick, moreover, acknowledged the differing medical opinions regarding Calandra's recovery, as referenced in the medical records admitted as exhibits. Calandra's trial counsel, furthermore, acknowledged conflicting information in the medical records in his closing argument. Counsel acknowledged Dr. DenBesten's conclusions, as well as the UPMC concussion clinic's conclusion that Calandra no longer exhibited concussion symptoms.

{¶ 42} Calandra's counsel challenged the jury to consider the credibility of the witnesses to resolve these factual issues, placing emphasis on the witnesses over the medical record. However, "[t]he opinion of an expert is not conclusive upon the jury and is but an item of evidence intended to assist the trier of fact in consideration with the other evidence of the case." *Croft v. State Farm Mut. Auto. Ins. Co.,* 2002 WL 18665, *3 (3d Dist.Jan.8, 2002), citing *Reder v. Antenucci,* 62 Ohio App.3d 139, 143-144 (11th Dist.1989) (additional citations omitted).

{¶ 43} On appeal, Calandra appears to reiterate her credibility argument, asserting the verdict was contrary to the expert's testimony, without addressing the evidence contained within the exhibits, admitted and considered as additional evidence by the jury. While the verdict was dependent on the jury's considerations of weight and credibility, these are matters that may not be considered by a trial court in ruling on a motion for judgment notwithstanding the verdict. (Citation omitted) *Posin* at 275; *see also Brondes Ford, Inc. v. Habitec Sec.,* 2015-Ohio-2441, ¶ 157-158 (6th Dist.) ("A motion for JNOV

18.

presents questions of law, not fact, "even though in deciding such a motion, it is necessary to review and consider the evidence.") (additional citations omitted.).

{¶ 44} Accordingly, construing the record in Rowbotham's favor, we find there is substantial evidence to support the jury's award of damages in this case, and the trial court did not err in denying Calandra's motion for judgment notwithstanding the verdict under Civ.R. 50(B). Furthermore, based on this record, we find no abuse of discretion by the trial court in denying the motion for new trial pursuant to Civ.R. 59(A)(6).

{¶ 45} While Calandra emphasizes the witness testimony that included two medical experts, the jury had both testimony and exhibits to consider in assessing Calandra's claim of accident-related injuries. Calandra had the burden of demonstrating a causal connection between the accident and her need for all the medical treatment she claimed in her prayer for economic damages. "Objective reasons in the record exist from which the jury could reject her claims[,]" and the jury was "free to believe or disbelieve" Calandra's witness testimony. *See Wilson v. Gildow,* 2003-Ohio-2534, ¶ 11 (6th Dist.), citing *Wamer, supra; Walker v. Holland,* 117 Ohio App.3d 775, 792 (2d Dist.1997). Considering the verdict, the jury was persuaded by Rowbotham's counsel and disbelieved Calandra's experts.

{¶ 46} Upon thorough review of the record, the jury had substantial, competent, and credible evidence upon which to base its verdict. Therefore, we find no abuse of discretion by the trial court in denying Calandra's motion for a new trial.

{¶ 47} Based on the foregoing, we find Calandra's first and second assignments of error not well-taken.

19.

## V.    Conclusion

**{¶ 48}** We affirm the judgment of the Ottawa County Common Pleas Court.

Calandra is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle
_____
JUDGE

Gene A. Zmuda
_____
JUDGE

Myron C. Duhart
CONCUR.                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.